HENRY WILLIAMS and others *against* NATHANIEL WILLIAMS.

The law of charitable uses as it existed in England at the time of the revolution, and the jurisdiction of the court of chancery over the subject, became the law of this state upon the adoption of the constitution of 1777, and has not been repealed.

It does not derive its origin from the statute 43 *Eliz.* chap. 4, nor depend upon it. It was borrowed from the civil law as modified by the institutions of Christianity, and at a very early period became part of the common law.

The statute of Elizabeth merely furnished a remedy for the abuse of charities. It was never applicable to the circumstances of this country, and could never have been executed in it.

Religious corporations formed under the general statute can receive bequests to an amount not exceeding that limited by its fourth section. (2 *R. S.* 212.)

The object of this class of corporations being to perpetuate the uses of the property acquired by them, a donor may prescribe as a condition of his gift that it be preserved in a particular manner, in order to render it subservient to the object for which he gives it.

The provisions of the Revised Statutes, "Of accumulations of personal property and of expectant estates in such property," do not affect property given in perpetuity to religious or charitable institutions.

Where a legacy is given to a religious corporation for a purpose authorized by law, but with a direction that it accumulate until it reaches a certain sum before its income shall be expended, the *direction* only is void, and the legacy is not defeated.

Williams *against* Williams.

Conveyances, devises and bequests for charitable uses, although defective for the want of a grantee or donee capable of taking, are supported by courts of equity.

The law in England by which the court of chancery applies a gift to *charity generally*, is here in force only so far as it is adapted to our political institutions. We have no magistrate clothed with the prerogative of the crown to direct the manner of executing an indefinite bequest to charity. Where a gift to a charitable use is so indefinite as to be incapable of being executed by a judicial decree, the representative of the donor must prevail over the charity.

The plaintiffs, residuary legatees under the will of Nathaniel Potter, late of Huntington, in Suffolk county, filed their bill in the late court of chancery to obtain the judgment of the court against the validity of two legacies; one in favor of the Presbyterian church and congregation of the village of Huntington, and the other in favor of trustees of a fund for the gratuitous education of certain poor children. The will was executed on the 9th day of November, 1841, and the testator died on the 24th day of the same month. After giving to two nephews and a niece certain real and personal estate, and to the latter the interest for life on the sum of two thousand dollars, and the right to use so much of the principal of that sum as her necessities might require, the will proceeds as follows: " I give and bequeath to the trustees of the Presbyterian church and congregation in the village of Huntington and their successors, in trust for the support of a minister of the said church as now constituted, the sum of six thousand dollars, to be managed in the manner following, to wit: the principal to be loaned on good landed security of twice the value of the sum loaned, and one half of the interest annually accruing to be added to the principal until the fund shall amount to ten thousand dollars. The other half of said interest to be applied to the support of a minister in such church; and as soon as the whole fund, by the addition of the interest as aforesaid, shall amount to the sum of ten thousand dollars, the whole interest annually accruing, to be annually applied to the support of the gospel minister in said church as now constituted." It was provided that a pew, free of

rent, in the church, should be reserved for the use of that part of the testator's family which might reside in Huntington. No part of the fund was to be applied to building or repairing the church; and any diversion of the fund from the purposes for which it was given, was to operate as a forfeiture in favor of his residuary legatees.

The other gift was in the following language: "With a desire to raise the standard of intellectual and moral improvement among the poor, I constitute and appoint Zophar B. Oakley, John Wood and Charles Sturges, of the village of Huntington, and their successors, to be appointed in the manner hereinafter authorized, a board of trustees of a fund, which I hereby constitute for the exclusive education of the children of the poor; and in order to maintain the number of the said trustees in perpetuity, I hereby authorize the surviving or remaining trustees, to fill up any vacancy as often as it shall occur by death, resignation or removal from the village, of any one of the said trustees by the choice of another, to be entered upon the minutes of their proceedings. I give and bequeath to the above named trustees and their successors, appointed as aforesaid, the sum of six thousand dollars, in trust, for a perpetual fund for the education of the children of the poor, who shall be educated in the academy in the village of Huntington; or in case of the destruction of the academy by fire or otherwise, then in the school house next west of the academy, until it shall be rebuilt. No part of this fund ever to be appropriated to the erection or repair of buildings. It is my will that this fund shall be managed in manner following, to wit: the principal to be loaned on bond, secured by mortgage of lands of twice the value of the sum loaned, and one half of the interest annually accruing to be added to the principal, until the whole fund amounts to the sum of ten thousand dollars. The other half of the interest to be appropriated and expended in the education of the children of the poor; and when the said fund, by the addition of the interest as aforesaid, shall

amount to the said sum of ten thousand dollars, then it is my will that the whole interest of the said fund shall be annually appropriated and expended in the education of the children of the poor, in the academy of the village of Huntington."

The instruction was to be limited to a good English education, which was to be extended " to the poor of every description, without discrimination of denomination or complexion." The children to be educated were to be those " whose parents' names are not on the tax list; and if the interest annually accruing shall be more than sufficient for this purpose, in such case the surplus shall be expended in the education of children whose parents stand lowest on the tax list, until the whole is absorbed."

There were some other provisions relating to the management of the fund; and it was to be forfeited to the residuary legatees in case of a diversion from the objects for which it was given. There was then the following clause: " If the powers of the board of trustees herein constituted shall prove insufficient for the execution of the duties of the trust, it is my will that they shall make application for a special act of incorporation, to enable them to give complete effect to my intentions as above stated."

He declared it to be his will that the children and grand children of his nephews and neices, should be educated out of the said fund. The two thousand dollars, the interest of which was given to his niece for life, and the surplus of it, was to be added to this fund at the death of his niece, but the interest of one thousand dollars of this money was annually appropriated " to the aid and relief of such necessitous persons as are not on the town," forever. The testator devised and bequeathed the remainder of his estate to the children and grand children of Gilbert Williams, deceased; to the widow and children of William Schenck, deceased; and to the children of Woodhull Smith; and appointed three persons, two of whom were also residuary legatees, executors.

Williams *against* Williams.

There were two codicils to the will, but their provisions do not affect the legacies in question.

The following facts were admitted in the pleadings: that the complainants and two of the defendants, who are also executors, are the persons referred to in the will as the residuary legatees: that the will had been admitted to probate, and the executors had taken out letters testamentary; that the Presbyterian church in Huntington had been incorporated as a religious society, by the name mentioned in the will, under the act providing for the creation of religious corporations; and that the personal estate of the testator was sufficient to pay the legacies, if they should be held valid. The complainants submit that the two legacies are void, on account of a perpetual suspension of the power of alienation contrary to law, and of the alleged illegal trusts for accumulation, and they pray for a decree that the rights of the residuary legatees to the moneys so attempted to be bequeathed, may be settled and declared.

The corporation of the Presbyterian Church in Huntington, and the three trustees of the education fund, put in their answer, admitting the facts stated, and claiming the legacies as valid dispositions. The executors also answered, admitting the facts, and submitting themselves to the judgment of the court.

In December, 1844, the cause having been heard before Judge RUGGLES, then vice chancellor of the second circuit, a decree was made, reciting that it appeared to the court that the two several legacies were valid, and dismissing the bill without costs. At a general term held in Kings county, in May, 1850, before Justices McCOUN, MORSE, BARCULO and BROWN, the vice chancellor's decree was reversed, and the legacies were declared to be void and the costs of all parties directed to be paid out of the fund in the hands of the executors. The defendants appealed from the decree to this court.

*George Wood*, for the appellants.
SEL. IV.—67.

*M. S. Bidwell,* for the respondents.

DENIO, J., delivered the opinion of the court. The legacy to the corporation of the Presbyterian congregation in Huntington, is free from the most serious of the objections urged against that to the trustees for the education of poor children. Both legacies are of personal property only; and both are therefore unembarrassed by some of the difficulties which might attend such dispositions of real estate. As to the legacy to the religious corporation: At common law a corporation could always take a bequest of such personal property as it could lawfully acquire by any other mode of purchase. (*Angel & Ames on Corp.* p. 111, § 6; *in the matter of Howe,* 1 *Paige,* 214; *McCarty* v. *Orphan Asylum Soc.,* 9 *Cow.* 437.) Religious corporations, under the general statute, are authorized to purchase and hold real and personal estate to a limited amount, which is not exceeded by this bequest. (1 *R. S.* 1181, § 4, 4th ed.) Whatever may be the construction of the terms " other pious uses," contained in this section, the right to take and hold property, clearly extends to such as may be necessary, within the specified limit, for the purposes of the church, congregation or society. The object of this bequest is, the support of a minister, which is one of the most prominent objects for which these corporations are created. It is not essential to the validity of a bequest to a religious corporation, that it should be given generally for all the purposes for which it may be legally used, or for any to which the trustees may see fit to devote it. This is apparent from the language of the provision, as well as from the reason of the case. These corporations are authorized to take property for the use of the society, " *or* other pious uses," which plainly shows that a benefactor may apply his bounty to the whole, or any one or more, of the various purposes for which the corporations are authorized to hold property. No doubt, I presume, could be entertained, that a bequest limited to the erection or repairing a church or parsonage,

the purchase of a glebe or churchyard, for providing sacred music, fuel, or lights, or the like, would be legally unexceptionable. *In the matter of Howe, supra*, where the purchase of a church library, and the support of a Sabbath school, were among the objects specified in a bequest to a church corporation, the chancellor said the testator had a right to limit his bounty to a part of the objects to which the corporation might appropriate its general funds.

But it is objected that this legacy is illegal as creating a perpetuity, contrary to the provision in 1 *R. S.* 773, § 1; by which the absolute ownership of personal property is forbidden to be suspended by will for more than two lives in being at the death of the testator. The effect of this provision upon pious and charitable gifts, in cases where there is not a corporation to administer them, will be hereafter considered, when the other legacy in question in this case comes to be examined; but as some difference of opinion is supposed to exist among the members of the court upon the subject of charitable uses, I am desirous of showing that the first mentioned legacy can be sustained without regard to that doctrine. It is unquestionable, that the general object, and one of the essential terms of this gift, requires that the funds shall be perpetually vested in the corporation, and the income only expended by the trustees; and I am free to admit, that the power to call in and reinvest, by which the specific funds will be frequently alienated, would not relieve it from the imputation of an illegal perpetuity, if the gift had been to trustees for private uses, or to carry out family arrangements. The opinion of Chancellor Walworth upon that point, seems to me unanswerable. (*Hawley* v. *James*, 5 *Paige*, 445.) But if by a fair construction of the act concerning religious corporations, it can be shown that corporations organized under its provisions were before the Revised Statutes, authorized to hold real and personal estate in perpetuity, contrary to the general principles of law, it can not, I think, be successfully maintained that the power is taken away by the

revised code.  When the mass of the existing statutes was repealed to make way for the revision, the legislature intentionally preserved untouched the act providing for religious incorporations.  This circumstance furnishes some evidence that it was not designed substantially to change the system; for the object of the revision being to provide a coherent and intelligible system of statute law, a series of enactments would not have been left apparently in force, which had been materially modified by other statutes then newly enacted.  Again: though the provision against perpetuities contained in the Revised Statutes, which has been referred to, contains language which in its generality would embrace endowments in favor of an eleemosynary, or ecclesiastical corporation, it does not follow with certainty that it was intended to repeal the special exceptions existing by force of former statutes.  It has been laid down that the law will not allow the exposition of a statute to revoke and alter, by construction of general words, any particular statute, where the words may have their proper operation without it. (*Dwarris on Stat. ed.* 1846, *p.* 532, and cases cited.)  An act of parliament had authorized individuals to inclose and embank portions of the soil under the river Thames, and had declared that such land should be " free from all taxes and assessments whatsoever."  The land tax act, subsequently passed, by general words embraced all the land in the kingdom; and the question came before the king's bench, whether the land mentioned in the former act act had been legally taxed; and it was held that the tax was illegal.  Lord Kenyon said; " It can not be contended that a subsequent act of parliament will not control the provisions of a prior statute, if it were *intended* to have that operation; but there are several cases in the books to show, that where the intention of the legislature was apparent that the subsequent act should not have such an operation, there, even though the words of such statute taken strictly and grammatically, would repeal the former act, the courts of law judging for the benefit of the

subject, have held that they ought not to receive such a construction." *(Williams* v. *Pritchard,* 4 *D. & E.* 2.) The rule deduced by Dwarris, from an examination of the authorities, is, that " where the intention of the legislature is not apparent to that purpose, the general words of another and later statute, shall not repeal the particular provisions of the former one." *(Dwarris,* p. 514.) The question then returns, whether a just construction of the statute respecting religious corporations, authorizes them to hold property granted to them, with a provision requiring the income to be permanently devoted to its uses, and forbidding the diversion of the principal from the proper objects of the society. In England, corporations connected with the church, and termed ecclesiastical, are subject to peculiar laws, and are distinguished in some particulars from lay eleemosynary corporations: but here, where there is no church establishment, and public worship and religious instruction are supported upon a voluntary system, no legal difference as to their general objects and power to hold property is believed to exist between our incorporated religious societies and corporations created for charitable and educational purposes. Even in England, gifts for the promotion of piety and religion, when unconnected with a strictly ecclesiastical corporation, belong to the class of charitable donations. " Eleemosynary corporations," says Shelford, " are such as are constituted for the *perpetual* distribution of the free alms and bounty of the founder of them to such persons as he has directed." *(Treatise on Mortmain,* p. 23.) The same definition is given by the supreme court of Connecticut, in *Asylum* v. *Phoenix Bank,* (4 *Conn. R.* 177.) See also *Angel & Ames on Corp.* 29; 1 *Bl. Com.* 471. In the case of *Dartmouth College* v. *Woodward,* (4 *Wheaton,* 641, 642,) Ch. J. Marshall said that the college, which was founded to promote the spreading of Christian knowledge among savages, was an " eleemosynary institution, incorporated for the purpose of *perpetuating* the application of the bounty of the donors to the specified

objects of that bounty;" and further on, he said, that the consideration of the gifts of the donors, was " the *perpetual* application of the fund to its object, in the mode prescribed by them." The point decided in that cause was, that the creation and endowment of Dartmouth college was a contract between the government and the donors, one of the terms of which was, that the lands should be held by the corporation in perpetuity to promote the pious and charitable objects of its institution. Indeed the main object for which this class of corporations is instituted, is to enable them to hold property in perpetuity, and to prevent its dispersion under the law of descents and distribution, upon the death of the person in whom the title is vested. Blackstone says, that perpetual succession is the very end of a corporation. (1 *Com.* 475.) Hence the early statutes of mortmain, from *Magna Carta* down, are principally aimed at accumulations of property in the hands of corporations. (*Shelford on Mortmain,* p. 2.) According to an accurate writer on the law of perpetuity, "When bodies corporate thus hold land in mortmain, there is clearly, to all intents and purposes, a settlement in perpetuity of such lands, since it seldom happens that corporations are led to make, or with fidelity to the corporate interests can make, absolute dispositions of their reality." The same principle, he says, " equally applies to all property that from the nature of the purposes to which it is devoted, or the character of the ownership to which it is subjected, is for every practicable purpose in a dead or unserviceable hand." "Land thus dedicated to the service of charity and religion is therefore practically inalienable" (*Lewis on Perpetuity,* 688.) The class of corporations to which the legatee in this case belongs, are authorized by the statute to purchase and hold real and personal estate "*for the use* of such church, congregation, or society." (§4.) The *use* of the church, the parsonage, the glebe, or the fund from which the annual stipend to the minister issues, is, from its nature, perpetual. The corporate body is legally immortal; and

it is the very nature of contributions to it, to withdraw the subject of them from every kind of circulation; their manifest object being to sustain continually the charitable or religious institutions, in carrying out their pious or benevolent designs. In England incorporation for charritable and religious purposes, are considered as exception to the laws against perpetuities. " In all these cases," says Lewis, " the law against perpetuities are substantially superseded, since the exercise of the privilege conferred by the legislature entirely withdraws the land alienated from commerce and circulation." (p. 708.) The object of this class of corporations, then, being to perpetuate the uses of the property acquired by them, it necessarily follows that it is legal for a donor to prescribe by way of limitation or condition, that his particular gift shall be kept and preserved so as to subserve the purposes which the corporation was created to promote, and that it shall not be wasted, alienated, or otherwise misappropriated. It is no more than to declare that the property shall be devoted to the objects which the legislature had in view in providing for the corporate existence of the grantee.

The next inquiry is, whether the provisions of the Revised Statutes concerning "expectant estates" in personal property, were intended to operate upon the faculty of this class of corporations, so as to prohibit them in future from becoming donees of funds, so limited by the instrument of donation as to secure the perpetual application of the income to the objects for which the corporations were created. ( 1 *R. S.* 773, § 1.) The *title* of the division of the statutes in which the enactment is found, affords some evidence, though perhaps slight, that it was not intended for the case of corporations. Perpetuities in property for the benefit of natural persons, can only be established by the creation of future estates. The general statutes relating to successions regulate the destination of property after the death of the possessor. The rules of succession may be modified by conveyances and testaments, but only to a limited extent. At the

expiration of two lives in being, at farthest, from the time the grant or devise takes effect, the volition of the former owner ceases, and the succession must return to the legal channel. The regulations which the owner is thus permitted to make, in derogation to the general laws of succession, are the limitation of *future estates*. An enactment, therefore, whose office it is to regulate *future estates*, is *prima facie* confined to provisions looking to successive interests, and generally in favor of natural persons, born or unborn. The idea of a future estate can not be connected with property conveyed or devised in perpetuity to an artificial person which never dies. It will always remain the same estate. There is nothing future or expectant about it. In *Kane* v. *Gott*, (24 *Wend.* 662,) Cowen, J., in delivering the only opinion given, declared that the section under consideration, related exclusively to *future* and *contingent* interests in personal property. But the case of a bequest to a corporation in perpetuity, is not within the words of the provision relied on. " The absolute ownership of personal property," is not to be " suspended," beyond two lives in being. By this bequest the absolute ownership is not suspended for a single day. Though there is a trust, in a certain sense, attached to the property, it is not such a trust as is recognized by that name by the laws of property. The ownership of the property of a corporation is as absolute and unqualified as that which the state has in its property. Its use is restricted to certain purposes which the law deems beneficial, and its alienation is prohibited, but no other person has any estate or legal interest in it.

Again: the absolute ownership may be suspended, but only during the continuance of *lives*. The interposition of the shortest possible absolute term, would be fatal to the limitation in cases subject to the provision. This affords some evidence that natural persons were alone in the contemplation of the legislature. The right to limit the suspension on lives, was designed to facilitate the adjustment of family arrangements, where it is often convenient to

give a present estate in enjoyment to one or more persons
in being, with a future estate in their offspring, or in per-
sons thereafter to come into existence.  Had the legislature
intended to apply the provision to corporations, where
none of the motives for making the limitation depend upon
lives apply, an absolute term, as at once the most simple
and the most certain, would have been fixed on, if it were
intended to allow a suspension at all.  But the considera-
tion which is the most satisfactory to my mind, is the im-
probability that the legislature could have intended to
change, in so essential a particular, the character and con-
stitution of all the religious and charitable corporations in
the state.  There was no evil which called for such an
enactment.  It was known, that while the trustees and
managers of these institutions performed their duties with
fidelity, funds acquired by them for objects in their nature
perpetual, would practically, as a general rule, be inalien-
able.  If this were considered an evil, the remedy would
have been a statute of mortmain embracing personal as well
as real property.  While they were permitted to hold pro-
perty at all, for purposes looking to indefinite continuity,
there was no imaginable mischief in allowing a limitation
or condition, in the grant or bequest, which should forbid
and prevent the alienation or misapplication of the funds.
Upon the construction contended for by the respondents,
it will be impostible hereafter for an individual, except in
a few cases provided for by special statutes, to endow an
incorporated academy, orphan asylum or hospital, or any
other religious, charitable, or benevolent institution, by a
conveyance or testament, which shall enjoin the applica-
tion of the donor's bounty to the perpetually recurring
objects which such institutions are designed to subserve.
In my judgment, the provisions of the Revised Statutes
respecting trusts, perpetuities, and the limitation of future
estates, were devised to restrain the natural propensity of
mankind to perpetuate their estates in their families, and
among the descendants of themselves, and their relatives

SEL. IV.—68

and friends, a propensity which the laws of the mother country have allowed to an extent which could not be tolerated in a purely representative government, where a degree of equality in social condition is indispensable. I think those provisions were not designed to, and do not at all affect conveyances or testamentary gifts to religious or charitable corporations.

Assuming that the provision in the same title of the Revised Statutes, forbidding accumulations of the interest of money, or the income of personal property, except for the benefit of, and during the minority of children, applies to the bequest under consideration, still this does not render the legacy wholly void. (1 *R. S.* 773, 774, §§ 3, 4, 5.) A will may be void as to part, for some illegality or violation of law, and valid as to the residue. (*Kane* v. *Gott*, 24 *Wend.* 641, 665.) The language of the fourth section is, that "*all directions* for the accumulation of the interest, income or profits of personal property, other than such as are herein allowed shall be void." It is the *direction* only which is void. Being void, it would seem that it should be stricken out of the will; and if that were done in this case, the legacy and the general purposes for which it was given, would remain. The six thousand dollars is not given for the purpose of the accumulation, but "for the support of a minister of the said church." The direction for accumulation is among the provisions touching the management of it. As it is found to be illegal to manage it in the way indicated in all respects, it is still to be loaned in the manner directed, and the whole income is to be applied according to the general purpose pointed out. If the direction for accumulation required, or would occasion, an illegal suspension of the absolute ownership, the whole provision might be void; but having determined that there is nothing illegal in the duration of the estate, what is said respecting accumulation, is simply a direction which the testator had no right to give, and which, according to the mandate of the statute, is to be held void.

Williams *against* Williams.

The statute (1 *R. S.* 748, § 2,) makes it the duty of the courts to carry into effect the intention of the testator so far as it is consistent with the rules of law. It is clear that he intended to give the $6000 to the church, for he says so in so many words; and although he also intended the church should accumulate a part of the interest for a time, for its own benefit, we have no warrant for saying that he would have withheld the gift had he known that the direction to accumulate was illegal. In *Lade* v. *Holford,* (1 *Wm. Blackstone's R.* 428,) a direction for accumulation in a will, was held void; but the devisee, whose estate was made subject to the direction to accumulate, was held to take it absolutely. (See 3 *Burr.* 1416, *S. C.;* and see also, *Thompson* v. *Thompson,* 1 *Collier,* 381, 400.) It seems to be settled in the Superior court, that where there is an authorized trust connected with an illegal direction for accumulation, the party for whose benefit the accumulation was directed, is entitled to the current income, as though nothing had been said respecting accumulation; (*Lang* v. *Ropke,* 5 *Sandf. S. C. R.* 363, 371.) In *De Kay* v. *Irving,* (5 *Denio,* 646,) where there were successive trusts of land, making together a limitation beyond the period allowed by the statute, it was held by the court for the correction of errors, that the first part, which was for the life of a person in being, was valid, and the residue only void. *Root* v. *Stuyvesant* (18 *Wend.* 257,) was decided on the ground that the power given to the devisee for life, to make leases for sixty-three years, was so important a feature in the testator's scheme, as made it quite certain that he would have made a different disposition of the property, had he known that such a power was illegal. This was determined by a divided vote, against the opinion of all the judges. Still it is a precedent for similar cases; but not for such an one as the present, where the part of the testamentary provision which is left, is quite consistent with the testator's general intention.

Upon this part of the case, I am of opinion that the be-

quest to the church is valid, and that so much of the bill as relates to this legacy, should be dismissed.

The bequest in favor of Zophar B. Oakley and others, by the general rules of law, would be defective and void as a conveyance in trust, for the want of a *cestui que trust*, in whom the equitable title could vest. The terms, "the children of the poor," refer to a class of persons to come into existence from time to time, not by inheritance, or any order of succession defined by law, but who are ascertained only by their answering the description mentioned. Such a line of succession not being known or recognized by the ordinary rules of law, can not be made the channel for the perpetual transmission of the legal or beneficial ownership of property, unless by force of that peculiar system of law known in England under the name of the law of charitable uses. The direct donees of the fund, not being a corporation, can not take and transmit the money in perpetual succession, according to the plan provided in the will; though, if the trust were valid, courts possessing the powers of the late court of chancery, would supply this defect, by appointments from time to time, as the exigencies of the case might require; and by directing conveyances when necessary; the rule being that the trust shall not fail for the want of a trustee. (*Lewin on Trusts*, 574, *et seq.*; and *Mc-Girr* v. *Aaron*, 1 *Penn. R.* 49.) The objection that the bequest in its nature calls for, and that the provisions of the will assume to create a perpetuity, is urged against this as well as the other bequest; and it can not now be met, as in the other case, by the answer that the legatee is a corporation authorized to hold in perpetuity. If the Revised Statutes apply to gifts for charitable purposes, this objection is fatal to the bequest.

According to the law of England, as understood at the time of the American Revolution, and as it exists at this day, conveyances, devises and bequests, for the support of charity or religion, though defective for the want of such a grantee or donee as the rules of law require in

other cases, would (when not within the purview of the mortmain act) be supported and established in the court of chancery. This I understand to be entirely undisputed. (*Case of Christ's College, Cambridge*, 1 *Wm. Blackstone's Rep.* 90; *Moggridge* v. *Thackwell*, 7 *Ves.* 36.) In the numerous discussions upon charitable gifts which have taken place in the courts in the United States, it has been uniformly assumed that the English doctrine, to the effect above stated, was well settled in that country, and was constantly acted upon there, while this state was an English colony. (*Baptist Association* v. *Hart*, 4 *Wheat.* 1; *Inglis* v. *The Sailor's Snug Harbor*, 3 *Pet.* 99; *Orphan Asylum* v. *McCarty*, 9 *Cow.* 437; *Going* v. *Emery*, 16 *Pick.* 107; *Vidal* v. *Girard's Executors*, 2 *Howard*, 127; *Dutch Church in Garden street* v. *Mott*, 7 *Paige*, 77; *Executors of Burr* v. *Smith*, 7 *Verm.* 241.) So far as my researches have gone, I have found no case or dictum, which would cast a doubt upon the validity of this bequest in the courts in England, at any time during the century preceding the nineteenth day of April, 1775. Having adopted the common law of England, so far as it was applicable to our circumstances, and conformable to our institutions, the law of charitable uses is in force here, unless, *first*, it was established by an English statute which has been abrogated; or, *secondly*, unless there is something in the system repugnant to our form of government; or, *thirdly*, unless it can be shown by the history of our colonial jurisprudence, that it was not in force here prior to the revolution; or, *lastly*, unless it has been abolished by the Revised Statutes. (*Const.* 1846, *Art.* 1, § 17; *Const.* 1822, *Art.* 7, § 13; *Const.* 1777, *Art.* 35; 1 *Kent's Com.* 472, 473, and note (*a*) to 5th ed.; *Bogardus* v. *Trinity Church*, 4 *Paige*, 198; *Canal Commissioners* v. *The People*, 5 *Wend.* 445; *Boehm* v. *Engle*, 1 *Dall.* 15; *Attorney General* v. *Stewart*, 2 *Merivale*, 162; *Ayres* v. *The Methodist Church, &c.* 3 *Sandf. Sup. Ct. R.* 368.)

In this class of cases it has always been strenuously maintained by those who have resisted an alleged charita-

ble donation, that the law of charitable uses originated in, and was created by, the statute of 43d *Elizabeth*, chapter 4; and that statute having been repealed in 1788, among the mass of English statutes which were not revised or re-enacted, it is plausibly if not conclusively argued from these premises, that the doctrine referred to has no existence in this state. (*Stat.* 1788, *ch.* 46, § 37.)  This argument is usually answered by a reference to cases adjudged in the English courts prior to the 43d of Elizabeth, showing that the peculiar law of charities was known and recognized before the statute, and to the opinion of distinguished judges in equity, who have affirmed that grants and devises to charities, which would be void but for this doctrine, were sustained in England as well before as since the statute.  These adjudications and dicta, have been so often cited and commented upon, that it is unnecessary to do more than, to refer to the books where they may be found collected. (*Mc-Carty* v. *The Orphan Asylum*, 9 *Cow.* 437, *per* Jones, Chancellor; *Executors of Burr* v. *Smith*, 7 *Vermont*, 241; *Vidal* v. *Girard's Executors*, 2 *Howard*, 127; *Story's Commentaries on Eq.*, ch. 31, § 1136 *et seq.*)  From a careful examination of these authorities, I have come to the conclusion that the law of charities was at an indefinite but early period in English judicial history, engrafted upon the common law: that its general maxims were derived from the civil law, as modified in the later periods of the Empire by the ecclesiastical element introduced with Christianity; and that the statute of charitable uses was not introductory of any new principles, but was only a new and less dilatory and expensive method of establishing charitable donations, which were understood to be valid by the laws antecedently in force.  The provisions of the statute itself afford irresistible evidence to my mind, that such was its design and effect. It recites that whereas lands, &c., (enumerating almost every species of property, including goods and stocks,) have been given, limited, appointed and assigned for relief of aged, impotent and poor people, &c., (enume-

rating the several descriptions of charity, including gifts for education,) " *which lands, &c. have not been employed according to the charitable intent of the giver;* for remedy whereof," the lord chancellor and the chancellor of the Duchy of Lancaster, are authorized to issue commissions into the several dioceses, directed to the bishop and his chancellor and others, to inquire by a jury, as to such gifts as are before enumerated, and the abuses of them, and to make orders, decrees and judgments, for the employment of the property for the purposes for which it was given; which orders are to be certified unto the court of chancery, there to be executed, until altered by the lord chancellor upon complaint of the party grieved. This is the substance of the first section. The second and third sections except the colleges within the universities, and certain municipal corporations, and corporations having visitors appointed by the founders, from the operation of the act. The fourth section preserves the jurisdiction of the ordinary. The fifth forbids any party interested from being named as a commissioner. The sixth saves the rights of purchasers for a valuable consideration, without notice or fraud, of property given to a charity, from the jurisdiction of the commissioners; but authorizes orders for recompense to be made against those who are guilty of a breach of trust. The seventh exempts from the jurisdiction of the commissioners, grants made to the sovereign during the last three preceding reigns. The eighth and ninth sections provide for certifying the acts of the commissioners into the court of chancery, and for their execution by the orders of the lord chancellor. The tenth and last section allows parties aggrieved by the orders of the commissioners to complain to the lord chancellor, who is authorized to annul, alter, or enlarge the decrees of the commissioners, " according to the intent of the donors," and to tax costs against such as shall complain without cause. (*See the statute at length in Viner's Ab., Tit. Charitable Uses, (A)* and *2 Stat. at Large,* 708.)

That the proceedings authorized by this statute were exceptional in their character, and not the exercise of the general jurisdiction of the court, is apparent, not only from the scope of the enactment, but from several cases adjudged soon after it was passed. In *Windsor* v. *The Inhabitants of Farnham*, (*Cro. Car.*, 40,) exceptions against a decree of the commissioners had been put in and the decree was confirmed in part and altered in part; and the question was whether the order of the lord chancellor could be examined upon a bill of review; and it was resolved by the chief justice and the chief baron, and two justices of the king's bench, to whom the question was referred, that the bill of review was not allowable; "but the decree in chancery," says the report, "is conclusive, and not to be further examined, because it takes its authority by act of parliament, and the act doth mention but one examination, and it is not to be resembled to a case where a decree is made by the chancellor by his ordinary authority." See also *Duke on Charitable Uses*, (p. 79, pl. 20,) where it is said that a decree of the chancellor under the statute can only be altered by act of parliament: also *Saul* v. *Wilson*, (2 *Vernon*, 118,) where it is held that in these cases an appeal does not lie to the house of lords. It has been held that in the cases excepted from the jurisdiction of the commissioners by the second section, a bill or information must be filed. (*Shelford*, 295; *Duke on Charitable Uses*, 93: 15 *Ves.* 305.) In *The King* v. *Newman*, (1 *Lev.* 284, *anno* 1670,) we find the court of chancery proceeding to establish a charitable devise, which, but for the charitable feature would have been void by the statute of mortmain, upon an information filed by the attorney general in the name of the King. The devise was to Trinity College, Cambridge, which was a case expressly excepted from the operation of the statute of Elizabeth. The proceedings by commission under this statute being thus special, it is difficult to perceive how the general jurisdiction over charitable gifts which the court of chancery had confessedly exercised upon bill and

information for more than a century before the Revolution, can be said to be based on this statute. That the two modes of proceeding are entirely distinct, is further apparent, from a late case, where the question was very much discussed whether the facts were such as made it proper for ·a commission, or whether it should be proceeded in under the general jurisdiction of the court. (*Ex parte Kirkby, Ravensworth Hospital,* 15 *Ves.* 305.) These references lead us to receive with confidence the following remarks of the able writer on the law of mortmain and charitable uses: " Commissions under this statute (43 *Eliz.*) have long fallen into disuse, partly by their abuse, and partly because they were found insufficient for prosecuting the claims in many instances; and in others because they were extremely unjust toward the persons who were called upon to account for property, and sought to be charged, and because they generally ended in the court of chancery. The general proceeding, therefore, in the case of charities, has been for many years past, by the *old mode of information* in the name of the attorney general, who brings the matter in question formally upon record, stating the claims that were made upon the individuals charged with a breach of trust, calling upon them to make a defence, and putting their defence upon record, and then having a complete issue upon the record, upon which the judgment of the court of chancery can be founded." (*Shelford,* 278.) The whole object of the statute of Elizabeth, seems to have been to provide the form of a remedy against the abuse of charities. That form has been long since abandoned, and relief in that class of cases is now sought under the ordinary forms of justice in use in the court of chancery. The present English doctrine of charities, does not, therefore, depend upon the statute, so far as the course of proceeding is concerned; for nothing could well be more dissimilar than the two modes. It can not be said that the existence of charitable gifts originated in the statute, for the preamble shows that the object in passing it was to reach gifts already in existence;

Sel. IV.—69.

to redress breaches of trust which had been committed by the trustees under donations theretofore made. If we suppose charitable donations to have been void before this statute, then the proceedings which it authorizes were intended to strip heirs and next of kin of their property, and to set on foot a class of eleemosynary establishments in violation of vested legal rights. It would have been an act of power which would not have failed to excite the attention of the historians and judges of that age, or of succeeding times; but I have not been able to find that such a view has ever been hinted at. Much significance has been attributed to the repeal of this statute by the legislature of this state; especially as the act of 9 *Geo.* II, ch. 36, restraining gifts to charitable uses under certain circumstances, was not reenacted, but was also repealed. The truth is, the statute of charitable uses was wholly inapplicable to the circumstances of this country, and could never have been executed in a single instance if it had been expressly reenacted. Our political system knows no ecclesiastical divisions, no dioceses, and no bishops. No commission could therefore have ever been issued. This was a sufficient reason for repealing the statute; but besides, the English court of chancery had long been accustomed to exercise a jurisdiction over charities quite independent of the statutory proceeding, which had become practically obsolete. No inference can therefore be drawn from its repeal, hostile to the legal existence and validity of charitable gifts. The most which can be said is, that we repealed an obsolete statute providing one mode of enforcing them, which was inapplicable to the situation of the country. The repeal of the statute of mortmain, if it was ever considered in force here, was a more significant act, but of a different tendency, I think, from that suggested. We may reasonably infer from it, an intention to give the greatest scope to the founding and endowing of institutions and trusts for promoting education and religion, and for the amelioration of those evils from which society, under the

happiest conditions, is never exempt. We were in the main destitute of such establishments, while the mother country, from which we had just separated, so abounded with them that it had become necessary to restrain gifts in their favor by public authority. The manner in which the two statutes are dealt with by the legislature of 1788, in my judgment, affords no ground for holding that the peculiar doctrines of charitable uses, and the jurisdiction which the court of chancery exercised over them, were intended to be abrogated, but leads to a directly contrary inference.

But it is said that in cases of charitable trusts, the English court of chancery continually refers to the statute of Elizabeth, to ascertain whether the trust is such a one as it ought to execute. This by no means proves that the jurisdiction was conferred by the statute. There were no reports of cases in chancery prior to the 43d of Elizabeth; but the parliament must be supposed to have been acquainted with the class of cases which had been antecedently held, and which the judges and the legal profession had considered good charitable gifts; and when a question subsequently arose, it was most natural for the court to refer to this legislative definition. The argument was this: At an early day, before the practice of reporting, we find that the legislature, when providing a summary process for abuses of charitable trusts, enumerated their various kinds. We take this enumeration as a safe general guide, and such gifts as fall within the description, and such others as bear an analogy to them, we will hold to be valid. Such uses are daily made of ancient statutes, in settling the principles of the common law; and had the statute been repealed in England, instead of becoming obsolete, as was actually the case, it would still be referred to in ascertaining what should be allowed as a valid charitable gift. It was in this sense that Sir William Grant, master of the rolls, referred to the statute, when he said, " The significa-tion of charity is derived *chiefly* from the statute of Eliza-beth. Those purposes are considered charitable, which the

statute enumerates, or which by analogies are deemed within its spirit and intendment; and to some such pur- pose every bequest to charity generally shall be applied." *Morice* v. *The Bishop of Durham.* 9 *Ves.* 405.) So Lord Chancellor Eldon, in the same case upon appeal, declared that " where the gift was to *charity generally,* it was the duty of the court to decree it to be applied to charity in the sense which the determinations have affixed to that word in this court, viz: either such charitable purposes as are expressed in the statute, or to purposes having analogy to these." (10 *Ves.* 541.) In this country, the question whether a gift to a particular purpose is a valid charitable gift, is to be resolved by a reference to the determinations of the English court of chancery, whether that court reposed itself upon the parliamentary definition, or arrived at its judgment in any other manner. I do not think it was ever said by any English judge, that the proceeding in charity cases by in- formation, was authorized by, or founded upon the statute. I concede that the English doctrine is in force here, only so far as it is adapted to our political condition. In that class of cases, therefore, where the gift is so indefinite that it can not be executed by the court, and where the purpose is illegal or impossible, the claim of the representatives of the donor must prevail over the charity. The reason is, that we have no magistrate clothed with the prerogatives of the crown, and our courts of justice are entrusted only with judicial authority. Where the gift is capable of be- ing executed by a judicial decree, I know of no reason why the court should refuse to execute it. It is unnecessary to decide in this case whether we could proceed upon the notion of approximation, where it is impossible to execute the gift, substantially according to the terms of the grant or devise. My own opinion is, that the distribution of powers among the great departments of the government, which is a fundamental doctrine in the American system, would prohibit the courts from exercising a jurisdiction so purely discretionary. But in this case, there is no occa-

sion for an executive sign manual, or for the application of what is called the *cy pres* doctrine. There is here a good trustee to take the funds in the first instance; and a succession of trustees may be provided by the court by new appointment, as often as circumstances may require. The trust is for the education of the children of the poor, at a particular institution of learning, which I presume to be an incorporated academy; and a rule of ready application is given for selecting the objects of the testator's bounty. It is true that no locality from which the poor children are to come, is prescribed, but practically, they will be chosen from families residing in the vicinity of the academy. If there should be an excess of beneficiaries, it will become the duty of the trustees to select such as are to enjoy the benefit of the legacy.

The cases in which the intervention of the king is required are very different. The rule upon this subject is laid down with precision by Sir William Grant, in *Ommanney* v. *Butcher.* (1 *Turner & Russell,* 260.) "The law upon cases of this sort," he says, "is now reduced to very clear and distinct principles. Where there is *a general, indefinite charitable purpose,* not fixing itself upon any particular object, the disposition is in the king, by the sign manual; but where the gift is to trustees, with *general,* or some objects pointed out, the court will take upon itself the execution of the trust." "If he (the executor) is not to take for his own benefit, the consequence is, that if a particular object, as the erection of a school, or even a general object, providing it can be seen what the purpose is, is pointed out, the court will execute the trust; but if there is an absence of discretion in individuals, and the object to which the fund is to be applied is of a general indefinite nature, the law casts the application of the fund upon the king as *parens patriæ.*" The gift in that case was of a residue, "to be given in private charity." In *Moggridge* v. *Thackwell,* (7 *Ves.* 36,) the same doctrine is laid down by Lord Eldon. The will in that case gave the re-

sidue to an individual, "desiring him to dispose of the same in such charities as he shall think fit, recommending poor clergymen who have large families and good charac- ters." Lord Thurlow had decided that this was sufficiently definite to be executed by the court; and Lord Eldon affirmed the decree on a rehearing. In *Cary* v. *Abbott*, (*Id.* 490,) the bequest was for the education of poor children in the Roman Catholic faith, which by the law of England was illegal, and the master of the rolls decreed that the fund should not go to the next of kin, but to such charitable purpose as the king under his sign manual should appoint. (See also *Reeve* v. *Attorney Gen.*, 3 *Hare*, 191; 2 *Story's Eq. Juris.* § 1190.) It is only where the purpose is indefinite, as in the case of a gift for charity generally, or has become impracticable on account of the death of a party who was to select the object, or is illegal, as in the case last referred to, that the aid of the crown is required.

I have not thus far taken notice of the cases upon this branch of the law in the courts of this state. In *Coggeshall* v. *Pelton*, (7 *John. Ch. R.* 292,) decided in 1823, Chancellor Kent decreed the payment of a legacy of personal property, bequeathed to a town for the purpose of erecting a town house, the town not being a corporation; putting the case expressly on the ground of a charitable bequest, and referring to some of the English cases. Clearly it could not have been supported on any other ground than the one on which the chancellor relied. *McCarty* v. *The Orphan Asylum Society*, (9 *Cow.* 437,) is strenuously relied on by the respondents' counsel, as a judgment on the precise question, favorable to his position in a court of last resort. The Orphan Asylum Society was a charitable corporation, not authorized to take by devise, and corporations not so authorized, it is well known were excepted from the statute of wills. One Jacobs devised the residue of his real and personal estate for the charitable purposes for which the corporation was created; but the provisions of the will being obscure, it was a question whether the devise

Williams *against* Williams.

was direct to the corporation, or to the executors, in trust for its use. The corporation filed its bill to establish the gift, and Chancellor Jones, before whom the cause was primarily heard, held, that the devise of the legal estate was to the executors, the corporation taking only in trust; or if it was a use executed by the statute of uses, or if the devise was direct to the corporation, it was a devise in trust for the charitable purposes referred to, and that by the law of charitable uses which he held to be in force in this state, the devise could be sustained, notwithstanding the inability of the corporation to take by devise; and in an opinion showing great research and ability, he determined the case in favor of the complainants, both as to the real and personal estate. This decree was reversed as to the real estate by the court for the correction of errors, the only opinion for reversal being given by Mr. Justice Woodworth, in which, as the report states, all the other members of the court who voted for reversal, concurred. The opinion is wholly devoted to the construction of the will and the act incorporating the complainants, upon the questions whether the devise was directly to the corporation, and whether it was authorized to take by devise, notwithstanding the exception in the statute of wills: both of which points he determined against the corporation. Nothing was said respecting the doctrine of charitable uses. The case unquestionably proves, that a corporation not authorized to take by devise, can not become a devisee of land, though it was created for the dispensing of charity, and although the devise was for the charitable purposes which it was formed to administer: further than this it does not go. But this does not call in question any doctrine which has ever been held in England. The chancellor's opinion (admitting that the devise was direct,) can not be sustained without striking out the exception in the statute of wills.

The cases of *Yates* v. *Yates*, (9 *Barb. S. C. R.* 324;) *Ayres* v. *The Trustees of the M. E. Church*, (3 *Sandf. S. C. R.* 351;) *Andrew* v. *The New York Bible and Common*

*Prayer Book Society*, (4 *id.* 156;) *Kneiskern* v. *The Lutheran Churches*, (1 *Sandf. Ch. R.* 439;) and *Shotwell* v. *Mott*, (2 *id.* 46,) being recent adjudications in courts of original jurisdiction, could not be properly availed of as precedents, if they were in harmony with each other; but moreover, the first three of them question or repudiate the existence of the law of charitable uses in this state; while the other two affirm it to be in force here, and oase relief upon it. Several of the most prominent of the cases in the Supreme Court of the United States, and of the sister states, have been referred to; but among these again, there is not entire harmony, though the weight of judicial opinion is greatly in favor of the existence of the doctrine in this country. I refer particularly to the cases of *Vidal* v. *Gerard's Executors;* and *Inglis* v. *The Trustees of the Sailor's Snug Harbor*, in the Federal court; *The Executors of Burr* v. *Smith*, in Vermont, and *Going* v. *Emery*, in Massachusetts, for very elaborate examinations of the subject, and precedents for the conclusion at which I have arrived. On a question where learned courts and judges have differed so widely, it is not becoming to dogmatize; but I feel bound, nevertheless, to express a firm conviction that the bequest under consideration is valid as a charitable gift; and that the repeal of the English statute of charitable uses has no just influence upon the question. There is nothing in the situation or circumstances of this country, or in our form of government, which renders the general principles of the law of charity, as understood in England, inapplicable to us. The duty of providing for the poor and necessitous, in respect to their physical wants, as well as in regard to their religious, moral and intellectual well being, does not depend upon the form of government, but is equally binding, whether the people are governed by representative institutions, or by hereditary rulers. Nor does the consideration that a religious establishment is forbidden, and that all preferences among religious denominations are prohibited, require the abolition of the law of charity. Should

it be conceded that the practice of systematic charity, and the legal sanctions by which it is regulated and sustained, were introduced into civilized society along with Christianity, this would not prove them to be inconsistent with our institutions. Waiving the examination of the question how far, or whether to any extent, Christianity in this state is a part of the law of the land, it may be safely affirmed that there is nothing in our institutions hostile to the general doctrines of the Christian religion. Although Christianity is not the religion of the state, considered as a political corporation, it is, nevertheless, closely interwoven into the texture of society, and is intimately connected with all our social habits, customs, and modes of life. The provision for creating religious corporations, recognizes the duty of the government to provide facilities for the voluntary establishment of public worship. A legally organized system for protecting and preserving gifts and donations in aid of Christian charity, would fall within the same principles, and would be equally unobjectionable. When, therefore, we find in the common law of England, which, so far as it is consistent with our political condition we have adopted, certain principles already established respecting voluntary conveyances to charity, I can see no reason growing out of our rejection of the principle of a state religion, for holding that they are inapplicable to our situation.

The research of another member of the court has brought to light an authentic piece of evidence to prove that the English doctrine of charities was considered in force in this colony prior to the revolution. In a manuscript volume of the orders of the court of chancery, under the colonial government, which is preserved in the office of the clerk of the court of appeals, there is found a record of the proceedings in a case determined in that court, held before the governor and council, in the year 1708, which bears directly upon the question. The attorney general filed an information against William Cullin, to compel the

SEL. IV.—70.

payment of seventy five pounds, bequeathed by one Nicholas Cullin for the benefit of the poor of New York and Albany, which was directed to be distributed by certain trustees named in the will,—fifty pounds among the poor people in New York, and twenty-five pounds to those in Albany. The bill of complaint alleged that the defendant, under a power of attorney from the executor in England, had possessed himself of the testator's estate in the colony, " out of which, according to equity, he ought to have paid the legacies aforesaid, *forasmach as the said legacies were given to pious and charitable uses.*" " And as the preservation of charitable uses is of great public benefit, and great concern to our Lady the Queen, and the poor aforesaid, in consideration whereof," &c., the attorney general prayed that the defendant might answer, and be decreed to pay the amount, &c. The defendant answered, and the cause being heard upon the pleadings, a decree was made that he should pay to the trustees the amount of the legacies to be distributed to the poor according to the will of the testator.

The remaining topic for consideration is the application of the provisions of the Revised Statutes against perpetuities to the last bequest in this will. Some of the considerations suggested when considering the first bequest, apply to the present question; the only difference in the cases being, that here there is no corporation created for the purpose of holding charitable funds in perpetuity. But in the absence of a corporation, I am of opinion that charitable gifts, from their nature, are excepted from the law respecting perpetuities. It should be remembered that the Revised Statutes were not the earliest laws against perpetuities which existed in this state. By the common law of England and of this country, it had long been settled that real estate could not be limited by way of executory devise, the most favorable method of creating perpetuities, for a longer period than for any number of lives in existence, and twenty-one years and a fraction afterwards. (4

*Kent's Com.* 17, 263 *to* 268; *Cadell* v. *Palmer,* 10 *Bing.,* 140.) The same rule applied equally to personal as to real property. (*Lewis on Perpetuities,* 169.) By the statute 39 and 40, of Geo. III, ch. 98, passed, as is said, in consequence of the decision upon the will of *Peter Thellusson,* (*Thellusson* v. *Woodford,* 4 *Ves.* 227,) a narrower limit was provided for trusts for accumulation, limiting the duration of such trusts to twenty-one years after the death of the settler, or during the minorities of persons in being at the time of the settlement. (1 *Jarman on Wills,* 266.) The several provisions in the Revised Statutes against limitations in suspense of the power of alienation, as to real estate, and of the absolute ownership as to personal property, were modifications of the English law upon that subject, in force here before the revision of the statutes, and of the statute of Geo. III, to which I have referred. This is evident, not only from the nature of the provisions, but from the express avowal of the revisors. (*See Revisors' notes,* 3 *R. S.,* [*2nd Ed.*] 572, 612.) Now it is perfectly certain, that the law of charitable uses in England, was never understood to be subject to the law against perpetuities; but, on the contrary, it formed a well settled exception to the operation of that law.

The almost innumerable examples of trusts calling for a continuous and perpetual application of the rents of land, and the income of stocks or moneys, to perpetually recurring subjects of charity, would alone prove this. One need only look into the enumeration in the statute of Elizabeth, or any collection of cases upon the law of charity, to see that perpetuity is of the essence of such donations. The gift of land or money to be expended, at once, or within any short period, would not meet the wishes of those who desire to benefit their race, any more than it would answer the necessities of the poor and unfortunate, who, by a stern law of our humanity, we have always with us. Hence Lewis says, that property dedicated to the service of charity and religion, is *practically inalienable*

(*Treatise on Perpetuities, p.* 689.) The same writer, whose work was published since the 40th of Geo. III, (in 1843,) has a chapter, entitled " *Of limitations, exempt from the operation of the rule against perpetuities.*"

The third class of exempt dispositions mentioned in this chapter is " limitations in mortmain, and to *charitable uses.*" (*Ch.* 32, *p.* 663.) Conveyances, devises, and bequests, for charitable purposes, are treated of throughout, as exempt from the otherwise almost universal law: for the alienation of property conveyed to such uses, he says: " would defeat their manifest object, viz: the sustentation of the charitable or religious institutions, or the carrying out *in continuity* of the benevolent purposes and designs in favor of which they are made." (p. 989.) The Revised Statutes were enacted, with a constant reference to the then existing law. Changes were not made for the mere purpose of innovation, but with a steady eye to the maxim which enjoins a strict attention to " the old law, the mischief, and the remedy." The old law was well defined: any number of lives might be selected, to which evidence would apply, and the estate might be rendered inalienable until the last survivor should die, and for more than twenty-one years afterwards. What the legislature undertook to do, was simply to shorten the period of suspension. Not a day was allowed as an absolute term; the *cestuis qui vie,* could not exceed two; and trusts for accumulation were strictly confined to minorities. And this, in my opinion, is all the change the legislature intended to make. There is no reason to believe that it was designed to extend the law against perpetuities to cases to which it had never been applied, and had never been intended to reach. It was certainly competent to abolish the law of charitable uses, either wholly or in part. Had it been thought desirable to limit and modify it, the statute of mortmain, (9 *Geo.* II, *ch.* 36,) was a pattern act, which could scarcely be improved, and which might readily have been extended to personal property; and if it had been

designed to abolish such gifts altogether, it is inconceiva-
ble that it should not have been done in language, which
would have contained at least some allusion to that branch
of the law.   To limit charitable trusts, which in their
nature involve the idea of indefinite continuity, by two lives
in being, is substantially to abrogate them; and this I am
sure would have been done by express and unequivocal
language, had it been intended to do it at all.   This view
of the subject is entirely satisfactory to my mind, for I can
not conceive a reason why the law of perpetuities contained
in the Revised Statutes, should be held to be more extensive
in its application to subjects, than the former law of perpe-
tuities, of which it was a revision; which clearly did not
embrace gifts to charitable uses.   For some further sug-
gestions of the same tendency, in which I fully concur, I
refer to the opinion of the late assistant vice chancellor
Sandford, in *Shotwell* v. *Mott* (*2d Sandf. Ch. R.* 54,) and to
the cases referred to in the note to that case.   I have not
overlooked what was said in the argument respecting the
statutes of 1839, 1840, and 1841, authorizing charitable
gifts in certain cases to existing corporations.   (*See 2d R.
S. 3d ed. p.* 23 *to* 26.)   There are so many reasons why it
might be desirable to enable donors to place their dona-
tions on a different footing from that on which they would
stand under what I suppose to be the existing law of chari-
table uses, that I do not think any inference unfavorable
to the existence of that law can fairly be drawn.   So far
as the corporations referred to were authorized to take
land by devise, a privilege was conferred which they did
not before possess.   Conveyances were authorized to
grantees, not corporations, and who had no authority to
hold upon trust.   The creation of corporations for religious
and charitable purposes which abound in the statute books,
provide to a certain extent for the same objects as charita-
ble uses; but it would be a violent inference to say that
they disprove the existence of any other method of holding
or administering charitable funds.

The result of my examination of the case is, that the law of charitable uses as it existed in England at the time of the revolution, and the jurisdiction of the court of chancery over these subjects, became the law of this state on the adoption of the constitution of 1777; that the law has not been repealed, and that the existing courts of this state having equity jurisdiction are bound to administer that law. It follows that the respondents are not entitled to the relief asked for by their bill; that the decree of the supreme court should be reversed, and the respondent's bill be dismissed. No costs are to be allowed to either party as against the other.

RUGGLES, Ch. J., MASON, MORSE and WILLARD, JJ., concurred.

GARDINER, JOHNSON and TAGGART, JJ.. dissented.

Judgment reversed, and complainant's bill dismissed.(*a*)

(*a*) In pursuance of the ruling in this case the following cases involving the same questions were decided at this term:

TUCKER and others *against* THE RECTOR, CHURCH WARDENS AND VESTRYMEN OF ST. CLEMENT'S CHURCH.

The facts in this case were as follows: On the 6th day of December, 1843, Ann Hamilton, being the owner of a lot of land in the city of New York, conveyed the same by deed to Francis Many; Many on the same day leased it to Mrs. Hamilton for the term of her natural life, and then by deed conveyed it to the rector, church wardens and vestrymen of St. Clement's Church, *habendum* "upon condition that the rents, issues and profits, of the premises hereby granted and conveyed, and in case the same shall be sold, the interest, income or dividends of the money for which the same shall be sold, shall be applied by the said parties of the second part to the maintenance and support of the rector or.minister for the time being of the said church, and for no other purpose whatsoever." The object of Mrs. Hamilton and Many in making the conveyance was to vest the title in the lot subject to a life estate in her in St. Clement's Church, as a gift for the purposes expressed in the deed from Many. No consideration was paid, or agreed to be paid for it. Mrs. Hamilton remained in possession of the lot up to the time of her death, when the plaintiffs, her heirs at law, filed their bill for the purpose of avoiding the deeds upon the ground that their intent was to create a trust not authorized by the statutes and illegal and void. The cause was heard by the superior court of the city of New York, which held

the conveyances valid and dismissed the bill.  (*See* 3 *Sand.* 242.)  The ap
peal in this court was argued by

*B. W. Boney*, for appellant.

*M. Hoffman*, for respondents.

The decree of the superior court was affirmed.

ANDREWS and others *against* THE GENERAL THEOLOGICAL SEMINARY OF
THE PROTESTANT EPISCOPAL CHURCH, THE NEW YORK BIBLE AND COM
MON PRAYER BOOK SOCIETY and others.

On the 14th December, 1821, Henry Pope, of Brooklyn, made a will, in which
after directing the payment of certain annuities were the following provisions.

" *Item.*  I give and bequeath to the trustees of the Protestant Episcopal
Theological Education Society in the state of New York, and to their success-
ors, in trust, forever, all my coins and medals which are in England or
America.

" *Item.*  After the death of the last annuitant, hereinbefore named and men-
tioned, I give and bequeath to the aforesaid trustees of the Protestant Episcopal
Theological Education Society in the state of New York, and to their success-
ors in trust, forever, the sum of two thousand dollars, for the purpose of found-
ing a scholarship, to be designated and known by the name of the *Kindred
Scholarship*," pursuant and conformably to the by-laws and regulations of
the said society, the interest of which is for the sole purpose of educating and
fitting for the ministry of the gospel, agreeably to the principles of worship
and canons of the Protestant Episcopal Church in the United States of America,
one or more of my kindred forever: and I furthermore order and appoint, that
the first youth so to be educated, shall be *Portentas Pope Benton*, my godson
above named, unless the said Portentas should prove to be of vicious and im-
moral habits, of which my trustees hereinafter named, in this and all future
cases, are to be the sole judges; and after him, my trustees hereinafter named,
are always to select such of my kindred (under which term are comprehended
the descendants of the above mentioned Lucinda Benton) as may appear to have
the most promising talents and genius for learning and literary acquirements,
and suitable, pious and moral dispositions and habits.  But it is always to be
expected, if they have it in their power so to do, that the parents of such youth
of my kindred so to be educated under the directions of the trustees of the above
mentioned Protestant Episcopal Theological Education Society, will qualify
him in the common rudiments of learning, and otherwise assist in his educa-
tion, unless the trustees of the said society should think proper to take the
whole care of fitting him for the ministry, as I have above directed; and in
case of surplus in the interest of the aforesaid sum, after defraying the expenses
aforesaid, the said surplus shall be added to the principal, and the trustees of
the said society shall have the power to appropriate the interest to the educa

tion, as above directed, of one òr more of my kindred. But if it should so happen, in the process of time, that none of my kindred are to be found, after due and diligent inquiry made, who are intended to have the benefit of this bequest, then and in that case my will is, (until such kindred is found,) that the annual interest of the said sum of two thousand dollars, above granted and bequeathed, shall be given to a person to be appointed by the bishop of the diocese of New York, who shall deliver a lecture in Trinity Church in the city of New York, upon the evidences and truths of the Christian religion, on the day of the opening of the convention of the Episcopal Church in the state of New York, and cause the same to be published.

" *Item.* And after the death of the last surviving annuitant, hereinafter named and mentioned, I give and bequeath to the children of all my nephews and nieces, both in England and America, and also to the children of Lucinda Benton before named, (always excepting the heir who under this my will shall inherit my said farm or plantation and tenements, called Peach Hill, situated in the town of Brooklyn above said, with the lots and pieces of wood land to the same belonging,) all my remaining estate and property, of whatever nature and kind not otherwise disposed of, to be equally divided and distributed among them by my said trustees hereinafter named, share and share alike. And I do order and direct my said trustees hereinafter named, to convert all my estates and effects then remaining into cash, if they, my said trustees, should consider this best, for the purpose of an equal and just distribution, according to the true intent and meaning thereof; and that they shall make such distribution, after the death of the last surviving annuitant aforesaid, among the aforesaid children in this clause of my will mentioned and intended, or to guardians duly appointed of such of them who may then be under age as aforesaid, as soon as they, my said trustees, may find it advantageous and convenient, without injury to my estates, and without necessary sacrifice in the disposition thereof. And as my trustees, hereinafter to be named, will have much trouble in managing the affairs of my estate, which I hope they will do for the general good of the family, my wish is, that they do appoint some fit and trusty person to assist as agent, who shall be suitably compensated for his trouble.

" *Item.* And to enable my trustees hereinafter named, to fulfill my last will and testament, and to carry the same into effect, according to the true intent and meaning thereof, I give, devise and bequeath to them, my said trustees, all my estate, both real and personal, in law and equity not heretofore specifically given, devised and bequeathed, and the reversion and reversions, remainder and remainders thereof; to have and to hold the same in trust, with full power and lawful authority to sell, transfer, dispose of the same, and every pnrt and parcel thereof, to the best advantage, according to their judgment, as fully and as absolutely as I myself can or might do, to all intents and purposes, within the true import and meaning of this my last will and testament. And I furthermore order and direct, that my said trustees hereinafter named, shall regularly, from time to time, and at all times, after paying all my just debts and the legacies and annuities before mentioned, put the surplus income and proceeds of my estate out at interest, upon good and sufficient security, in order to in-

crease the capital fund, until the death of the last surviving annuitant, before named and mentioned."

And the will further contained as follows

"And lastly, I order, constitute and appoint the right reverend John Henry Hobart, doctor in divinity, bishop of the Protestant Episcopal Church in the diocese of New York, and his successors in the said diocese, forever; the reverend Thomas Lyell, rector of Christ Church in the city of New York, or his successor as rector of that church, forever; the Rev. Henry U. Onderdonk, rector of St. Ann's Church, in the town of Brooklyn, in the county of Kings, or his successor as rector of that church forever; and my esteemed friend, Jeremiah Lott, Esq. of the town of Flatbush, in the said county of Kings, his executors and administrators, to be my executors and trustees to see this my last will and testament duly executed."

On the third day of February, 1822, the testator made a codicil to his will, containing the following:

"I do hereby, in addition to the legacies contained in my said will, give and bequeath to the Auxiliary Bible and Common Prayer Book Society, at the death of the last annuitant named in my said last will and testament, the sum of fifteen hundred dollars; which said sum is to be invested in public securities bearing interest, or placed out upon good real security by the said society, and the interest thereof to be added to the principal for twenty-one years from said death, or until the said sum, by compound interest, shall amount to five thousand dollars, whichever shall first happen, and then and thereafter the interest upon the said sum of five thousand dollars shall be laid out yearly, and every year, in the purchase of Common Prayer Books, to be given to such person or persons as the said society may deem fit and proper, but in particular to any new church in the country, that may in their judgment stand in need of them.

And whereas, in and by my said last will and testament, I have made a certain bequest of my coins and medals which are in England and America, as is therein expressed and contained; and also have given and bequeathed the sum of two thousand dollars, after the death of the last surviving annuitant in my said will named, to certain persons therein designated, for certain purposes, and upon certain trusts expressed therein. And whereas it is my intention to alter and modify the bequests and gifts aforesaid, in the manner hereinafter mentioned, now, therefore, I do hereby give and bequeath all the said coins and medals upon my decease, and the said sum of two thousand dollars, at and immediately after the death of the last surviving annuitant in my said will named, to the trustees and executors in my said will named, and the survivor and survivors of them, and his executors and administrators, to the intent and upon trust, that if upon the death of the said surviving annuitant, there shall be in existence any theological school, seminary or college, within the state of New York, formed or established by or under the authority, or with the approbation or consent of the general convention of the Protestant Episcopal Church of the United States of America, for the education or instruction of young men intended for the ministry in the said church, in theological learning,

S<small>EL</small>. IV.—71

that then my said trustees, or the survivor or survivors of them, or the executors or administrators of such survivor, shall deliver the said coins and medals, and pay the said sum of money to the guardians, managers, trustees, rulers or governors of such school, seminary or college, or such person or persons as they or a majority of them shall direct; to the intent that the said coins and medals may be preserved for the use of the said school, seminary or college. And that the said sum of money may be invested in public stock bearing interest, or lent at interest upon good real security. And the interest thereof, or so much thereof as may be necessary to be applied from time to time, for and towards the support of the scholarship in said institution, to be named as is appointed in and by my said will, and filled by one of my family or kindred, as in the said will described, if any such shall offer himself, or be found of proper age and qualifications for, and willing to accept the same, and in case of any surplus beyond what shall be a reasonable allowance for such support and the instruction of such scholar, the same shall be disposed of and accumulate as in my said will directed; and whenever it shall or may happen that none of my kindred shall offer, or be found after diligent inquiry, qualified and willing to fill such scholarship, then and in such case, the yearly interest of the said fund, or so much thereof as shall be competent for that purpose, shall be given to such person in priest's orders in said church, as the bishop thereof, for the diocese of New York, for the time being, shall or may appoint, who shall preach in Trinity Church, at such time or times during the sitting of the convention of the Protestant Episcopal Church, in the said state, as the said bishop shall or may think proper and appoint, one or more lectures of his own composition, upon the subject in my said will mentioned, and afterwards print and publish the same. And such last mentioned disposition of the said interest shall continue yearly, until one of my kindred shall be found willing and qualified to take the said scholarship, and shall then cease; but the like disposition of the said interest shall be made forever thereafter, in every the like case on the vacancy of the scholarship. But if no such school, seminary or college, shall be in existence at the time of the death of the said surviving annuitant, then my said trustees, and the survivors and survivor of them, and his executors and administrators shall keep the said coins and medals, and invest the said sum of money, or let it out at interest as aforesaid, so as to accumulate until such school, seminary or college shall be formed or established as aforesaid; and thereupon they shall act in all respects as is above directed in case such a school, or seminary, or college had been in existence at the time of the death of the last surviving annuitant, provided always, that if no such institution shall take place within twenty-one years after such death of the surviving annuitant, the said coins, medals and accumulated fund shall then revert and fall into the residue of my estate."

The testator died in 1827, leaving considerable real and personal estate. The executors and trustees named in the will declined accepting letters testamentary, and administration was granted to Henry Andrew.

At the time of the testator's death, the General Theological Seminary was a corporation existing under an act of the legislature, passed April 5, 1822, and

Williams *against* Williams.

the Auxiliary Common Prayer Book Society, a corporation under an act passed March 28, 1817, which expired March 28, 1837, when the corporation transferred its funds to the New York Bible and Common Prayer Book Society, a corporation having the same objects, and which continued in existence up to the commencement of the action, and which claimed to be the successor of the former institution.

The last survivor of the annuitants died December 28, 1844.

In 1845, the plaintiff, one of the testator's next of kin, filed his bill in chancery before the vice chancellor of the first circuit, praying, among other things, an interpretation of the will and the judgment of the court as to the validity of the legacies. The cause was heard upon pleadings and proofs before the Hon. A. L. ROBERTSON, late assistant vice chancellor, and a decree made therein on the 13th June, 1847, declaring the legacies void. An appeal was thereupon brought and heard before the superior court of the city of New York, which on the 23d of January, 1851, affirmed the decree. (*See* 4 *Sand.* 156.) The legatees appealed to this court, when the cause was argued by

*M. Hoffman*, for appellant, and

*B. W. Bonney*, for respondent,

and the decree of the supreme court and of the vice chancellor were reversed, upon the ground that all the bequests to the institutions might eventually be sustained as gifts to religious and charitable uses, but without determining absolutely the question as to the Auxiliary Bible and Common Prayer Book Society, as there was no trustee before the court who could claim the disposition of the legacy to that institution. The record was therefore remitted, with leave to the complainants to amend their bill so as to make the attorney general a party and to proceed with the cause in the courts below.