(158 App. Div. 738.)

TRUSTEES OF SAILORS' SNUG HARBOR et al. v. CARMODY, Atty. Gen.

(Supreme Court, Appellate Division, First Department. November 7, 1913.)

1. CHARITIES (§ 39*)—CHARITABLE CORPORATION—TITLE TO PROPERTY.

Under Laws 1806, c. 4, incorporating the testamentary trustees of the residuary estate of a testator as the Trustees of the Sailors' Snug Harbor, to give effect to the charitable purposes expressed in the will, the entire title, to all the real and personal property devised and bequeathed,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

vested in the corporation for the purpose named in the statute, and the individual trustees have no title.

[Ed. Note.—For other cases, see Charities, Cent. Dig. § 100; Dec. Dig. § 39.*]

2. CHARITIES (§ 37*)—"CY PRES."

The "cy pres" doctrine is one which is involved whenever it is sought to establish a charitable use void at law, and does not apply where there is a definite use capable of being specifically executed with trustees competent to take.

[Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 91–93; Dec. Dig. § 37.*

For other definitions, see Words and Phrases, vol. 2, pp. 1809, 1810.]

3. CHARITIES (§ 35*)—TRUSTS—TITLE OF CORPORATION.

Where a testator devised property to his trustees for the establishment of a retreat for aged and decrepit sailors and directing the trustees to create a corporation, if necessary, for the proper administration of the trust, and declaring his intention that his heirs should never receive his property, the property itself was charged with the trust regardless of the title of the trustees or the corporation.

[Ed. Note.—For other cases, see Charities, Cent. Dig. § 67; Dec. Dig. § 35.*]

4. CHARITIES (§ 43*)—CHARITABLE TRUSTS—INCORPORATION.

Where the trustees of a charitable trust are incorporated by the Legislature, that fact does not change the nature of the trust or divest the usual power of courts of equity over the management of such a trust.

[Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 83–90; Dec. Dig. § 43.*]

5. CHARITIES (§ 43*)—VISITATION—SUPREME COURT.

The powers and duties not only of the Court of Chancery but of the chancellor have devolved upon the Supreme Court, and that tribunal may direct the management of the charitable trust.

[Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 83–90; Dec. Dig. § 43.*]

6. CHARITIES (§ 43*)—CHARITABLE TRUSTS—INCORPORATION.

Where the trustees of a charitable trust, created to provide a home for aged and indigent sailors, were incorporated by act of 1806, the incorporation legalized the trust, if it was before invalid, and extended the power of the chancellor and Court of Chancery over it.

[Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 83–90; Dec. Dig. § 43.*]

7. CHARITIES (§ 43*)—CHARITABLE TRUSTS—STATUTES—APPLICATION.

The Tilden Act, Real Property Law (Consol. Laws 1909, c. 50) § 113, par. 1, declares that no grant or devise to a charitable use shall be held invalid by reason of the indefiniteness or uncertainty of the persons designated as beneficiaries, and in paragraph 2 declares that the Supreme Court shall have control over gifts, grants, and devises in all cases provided for by subdivision 1 in this section. Held that, while paragraph 1 does not apply to trusts created prior to its enactment, paragraph 2 is applicable to all charitable trusts, whether previously created or not, giving the Supreme Court authority to administer them.

[Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 83–90; Dec. Dig. § 43.*]

8. CHARITIES (§ 43*)—CHARITABLE TRUSTS—POWER OF COURT.

Laws 1828, c. 276, which authorized the corporation of the Sailors' Snug Harbor, a charitable trust, to lease land, is merely permissive and does not deprive the Court of Chancery of its inherent jurisdiction to admin-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ister the trust and cause the sale of land when necessary for reinvestment, or protection of the trust property.

[Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 83–90; Dec. Dig. § 43.*]

9. CHARITIES (§ 43*)—ACTIONS—DEFENDANTS.

Both at common law and under the direct provisions of Real Property Law (Consol. Laws 1909, c. 50) § 113, par. 3, an action by the trustees of a charitable trust for directions to sell part of the property so as to improve and save the rest may be brought against the Attorney General as the sole party defendant; it appearing that the beneficiaries were an indefinite class.

[Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 83–90; Dec. Dig. § 43.*]

10. CHARITIES (§ 43*)—PROCEEDINGS FOR SALE OF PROPERTY—ACTION.

Notwithstanding the Tilden Act, Real Property Law (Consol. Laws 1909, c. 50) referring to charities, contemplates a summary petition by the trustees for leave to sell land, the trustees may proceed by action making the Attorney General the party defendant.

[Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 83–90; Dec. Dig. § 43.*]

11. CHARITIES (§ 35*)—CHARITABLE TRUSTS—SALE OF LAND.

Where a testator devised land in trust for the establishment of a Sailors' Snug Harbor as a retreat for aged and indigent sailors, and the trustees were incorporated, a sale of a part of the property does not destroy a vested estate, as the entire title is vested in the trustees; the testator's heirs having no reversionary interest, and the uncertain beneficiaries having no standing in court for any purpose, their interest being in the care of the state as parens partiæ.

[Ed. Note.—For other cases, see Charities, Cent. Dig. § 67; Dec. Dig. § 35.*]

12. CHARITIES (§ 43*)—SALE OF TRUST PROPERTY—RIGHT TO SELL.

Where property devoted to a charitable use had been leased on long-term leases, and at the beginning of the expiration of such leases the character of the property had changed so that its value would greatly depreciate if new buildings were not erected, the trustees might properly invoke the aid of equity to permit them to sell part of the property and erect suitable buildings on the remainder.

[Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 83–90; Dec. Dig. § 43.*]

Appeal from Trial Term, New York County.

Action by the Trustees of the Sailors' Snug Harbor and others against Thomas Carmody, as Attorney General. From a judgment dismissing the complaint (77 Misc. Rep. 494, 137 N. Y. Supp. 968), plaintiffs appeal. Reversed and remanded.

By this action the plaintiffs seek authority either to sell or mortgage a portion of the real estate devised by the will of Robert R. Randall, deceased; also for instructions as to their power in certain particulars to deal with such real estate and the accretions of rents and other accumulations therefrom.

Capt. Randall died in the year 1801, having in June of that year made his last will and testament, probate of which was regularly made in this city. The provisions of his will, which bear upon the issues in this action, are as follows:

"Sixthly. As to and concerning all the rest, residue and remainder of my estate, both real & personal, I give, devise and bequeath the same unto the chancellor of the state of New York, the mayor and recorder of the city of New York, the president of the Chamber of Commerce in the city of New York, the president and vice president of the Marine Society of the city of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

New York, the senior minister of the Episcopal Church in the said city, and the senior minister of the Presbyterian Church in the said city; to have and to hold all and singular the rest, residue, and remainder of my real and personal estate, unto them, the said chancellor of the state of New York, mayor of the city of New York, the recorder of the city of New York, the president of the Chamber of Commerce, president and vice president of the Marine Society, senior minister of the Episcopal Church, and senior minister of the Presbyterian Church in the said city, for the time being, and their respective successors in the said offices, forever, to, for and upon the uses, trusts, intents and purposes, and subject to the direction and appointments hereinafter mentioned and declared concerning the same; that is to say, out of the rents, issues, and profits of the said rest, residue and remainder of my said real and personal estate, to erect and build upon some eligible part of the land upon which I now reside, an asylum, or Marine Hospital, to be called 'The Sailors' Snug Harbor,' for the purpose of maintaining and supporting, aged, decrepit and worn-out sailors, as soon as they, my said charity trustees, or a majority of them, shall judge the proceeds of the said estate will support fifty of the said sailors and upwards. And I do hereby direct that the income of the said real and personal estate, given as aforesaid to my said charity trustees, shall forever hereafter be used and applied for supporting the asylum or Marine Hospital hereby directed to be built, and for maintaining sailors of the above description therein in such manner as the said trustees, or a majority of them, may from time to time, or their successors in office may from time to time, direct. And it is my intention that the institution hereby directed and created shall be perpetual, and that the above mentioned officers for the time being and their successors, should forever continue and be the governors thereof, and have the superintendence of the same, and it is my will and desire that if it cannot legally be done, according to my above intention, by them without an act of the Legislature, it is my will and desire that they will, as soon as possible, apply for an act of the Legislature, to incorporate them for the purposes above specified. And I do further declare it to be (my) will and intention that the said rest, residue and remainder of my real and personal estate should be, at all events applied for the uses and purposes above set forth; and that it is my desire all courts of law and equity will so construe this, my said will, as to have the said estate appropriated to the above uses, and that the same should in no case for want of legal form or otherwise, be so construed as that my relations, or any other persons, should heir, possess or enjoy my property, except in the manner and for the uses hereinabove specified."

The foregoing residuary clause covered both real and personal property; the former including premises with which this action is principally concerned, and consisting of upwards of 22 acres of land which, at the time of the testator's death, lay remote from the city, but afterwards was included within the Fifteenth ward thereof, and lies in the district embraced within Waverly Place, Eighth street, Fourth and Fifth avenues. At the instance of the trustees named in the will, in the year 1806, the Legislature passed an act (Laws of 1806, c. 4), entitled "An act to encorporate the trustees of the Marine Hospital, called the Sailors' Snug Harbor, in the city of New York." The preamble to this act recited that it had been represented to the Legislature that Capt. Randall had devised his residuary estate to the chancellor of this state, and to the other incumbents of the several offices enumerated in the will, and to their successors in office, in trust, for the purposes described in the will, and had "declared his intention to be that the said estate should at all events be applied to the purposes aforesaid and no other; and, if his said intent could not be carried into effect without an act of incorporation, he then expressed his desire that his said trustees would apply to the Legislature for incorporation"; that the said trustees had represented that the estate so devised would, in time, if prudently managed, enable them to carry the testator's purposes into practical effect, but that, inasmuch as they held their trusteeships under the will only during their ephemeral incumbancy of the offices they respectively held, inconveniences had arisen in the management of the estate, to overcome which they "prayed to be incorporated for the purposes expressed in the will."

By the first section of the act, "John Lansing, Junior, the chancellor of this state," and the other officials named in the will, "and their successors in office respectively, in virtue of their said offices," were "constituted a body politic, by the name and style of the 'Trustees of the Sailors' Snug Harbor in the City of New York,'" by which name they and their successors were given continual succession and other corporate functions and were declared to "be capable, in law, of holding and disposing of the said real and personal estate devised and bequeathed as aforesaid, according to the intention of the said will and the same is hereby declared to be vested in them and their successors in office, for the purposes therein expressed." Power to purchase, hold, and convey "any other real and personal estate for the use and benefit of the corporation, in such manner as to the trustees should be deemed most conducive to the interests of the institution," was likewise given. The second section of the act conferred upon the trustees power to make rules for the government of the corporation and contained other provisions for the organization of the internal affairs of the corporation and its trustees and for the regulation thereof. By the third and last section, the act was declared to be a "public act and to be construed in all courts and places benignly and favorably for the purposes therein intended."

The accumulations of the estate having as yet proven insufficient to carry out the purposes of the will, and time having demonstrated that it was undesirable to establish the Sailors' Snug Harbor upon any of the testator's lands, by procurement of the trustees, in the year 1828 an act was passed (Laws of 1828, c. 276) which, among other things, authorized the trustees, with the approval of the Court of Chancery, to purchase a suitable tract upon which to build and maintain the Harbor, and thereupon "it shall be lawful for the said trustees to lease all the lots now belonging to the" corporation. In pursuance of this act, the trustees purchased land and located the Harbor on Staten Island, and by authority of the same act they adopted a plan for the improvement and development of their Fifteenth Ward property. Pursuant to this plan, the property was divided into lots each approximately 25 by 100 feet, and leased upon long-term ground leases, many of which have fallen in, while many others have still considerable periods to run. Under these leases the tenants erected their own improvements and paid to the trustees a net rental over and above all taxes and other charges which were borne by the tenants.

The complaint further alleges that the type of buildings which were erected upon a large number of the lots in question, while appropriate to the uses to which the land was then adapted, where they have not become worn out and worthless, have become obsolete and unadapted and unadaptable to the only use or uses to which it is now practical to devote them; that as to a large portion of the property, from a district of residences, the neighborhood has become one devoted chiefly to business; and that, in order to uphold values, already much depreciated in the very considerable section in question, and to prevent a further and increasing sacrifice of income by driving desirable business permanently away, it is necessary that the property should be improved in an appropriate manner, a course which involves the buying up of leases and also the erection of suitable improvements by the plaintiff corporation (for which purposes it lacks the necessary means), or the sale of portions of the property to those who may wish to buy and improve. Upon these and other minor subjects the plaintiff prayed for the instruction and authority of the court.

Argued before INGRAHAM, P. J., and LAUGHLIN, SCOTT, DOWLING, and HOTCHKISS, JJ.

Lewis L. Delafield, of New York City, for appellants.
Henry S. Bacon, Deputy Atty. Gen., for respondent.

HOTCHKISS, J. The plaintiffs invoke the equitable jurisdiction of the court to the end that the laudable purposes of the testator may be perpetuated in as generous a measure as a wise and practical ad-

ministration of the estate may afford, and that these purposes be not defeated by conditions unforeseen and unforeseeable when the will was executed.  In brief, the plaintiffs contend that the residuary clause of the will was a devise to a charitable use; that a charitable use was affixed by the will upon the land; that, upon the grant of the charter of 1806 to the trustees, the corporation thus formed acquired the legal title by virtue of the aforesaid devise for the charitable use expressed in the will, and thus through sovereign grace became the agency by means of which the devise was to be executed; that although the state might as parens patriæ grant the relief sought through the medium of this action, as in fact it theretofore had by the act of 1828 granted similar relief, the Supreme Court had concurrent jurisdiction, which may be invoked either by the corporation, as donee of the charitable use, or by the state through its Attorney General. Stated substantially in the words of their brief, the plaintiffs claim that upon the passage of the act of 1806, *as to this particular charity,* the law of charities as formerly applied in England (except in so far as it rested either upon the royal prerogative or upon the Statute of 43 Elizabeth, 4) was restored and our then Court of Chancery reinvested with authority to apply and administer the same, which authority has passed to the Supreme Court; also, that similar jurisdiction and authority was conferred upon the Supreme Court by virtue of the so-called Tilden Act (Laws of 1893, c. 701, as amended Laws of 1901, c. 291), now contained in section 113, Real Property Law, and section 12, Personal Property Law.  I put plaintiffs' claim in the broad language of their brief, that it may be contrasted with the somewhat narrower limits to which I shall confine myself, because, while not denying the broader jurisdiction, I do not think it necessary for the decision of this case to define the exact extent of our jurisdiction over the subject of charities.  It will be quite sufficient if we find that the court has within its ordinary equity jurisdiction, or within that jurisdiction over charities which was embraced within its purely judicial powers, particularly as distinguished from certain powers exercised by the English Chancellor and which lay in a sort of twilight zone between the judicial and the prerogative (see Adams Equity [1st Ed.] 73–77; 2 Story's Eq. Juris. [3 Ed.] § 1142 et seq.; also, per Selden, Owens v. Missionary Society, 14 N. Y. 380, 387, 388, 408, 67 Am. Dec. 160; per Johnson, J., Inglis v. Trustees, etc., 3 Pet. 137, 138, 7 L. Ed. 617), jurisdiction to grant appropriate relief upon the facts disclosed by the complaint.

The position taken by the learned Attorney General, and in which he has so far been successful, is that neither the corporate nor the individual plaintiffs hold the property subject to any trust, under the Randall will or otherwise, but that it is held by the corporation absolutely, for the purposes expressed in the act of incorporation; that the powers of the corporation are to be found in the said act and those supplemental thereto, and in the general statutes of the state, so far as the same are applicable; and that, if the corporation lacks power to do the things it seeks by this action authority to do, it must secure such authority from the Legislature, this court being without

jurisdiction in the premises. It is also urged as ground for dismissing the complaint that, if jurisdiction exists to grant the relief sought for, it may only be exercised in a proceeding initiated by the Attorney General, or, at least, that plaintiffs' remedy, if any, is by petition and not by action; also, that to authorize any sale of the property would be to destroy a vested estate.

[1] Before examining the questions thus presented, it is proper to say that I see no reason for the individual trustees being made parties hereto. Concededly, the whole legal title to the property is in the corporation, and the trustees, as such, have no interest therein, or at least no interest which attaches to the title.

[2] It will facilitate the task before us if we keep in mind the fact that, whether we assume the will to be valid within the doctrine of Burrill v. Boardman, 43 N. Y. 254, 3 Am. Rep. 694, and kindred cases, or to have been validated by the act of 1806, the situation presented is one of a definite use, capable of being specifically executed, with trustees competent to take. It accordingly presents none of the difficulties associated with that branch of the law of charities, or of the cy pres doctrine, which necessarily was invoked whenever it was sought to establish a charitable use, void at law, and which gave rise to the series of cases finally resulting in the overthrow of the entire law of charities in this state. See Holland v. Alcock, 108 N. Y. 312, 319, et seq., 16 N. E. 305, 2 Am. St. Rep. 420.

[3] Manifestly, the primary question is the nature and quality of the title thus held by the corporation. This question has been simplified, if not authoritatively settled, by the decision in Inglis v. Trustees of Sailors' Snug Harbor, 3 Pet. 99, 7 L. Ed. 617, in which the demandant, Inglis, claiming as heir of Capt. Randall, sought to recover all or certain of the premises in question, and in which case the validity of the will was determined. The opinion of the court was by Mr. Justice Thompson; Mr. Justice Story and Chief Justice Marshall dissenting. The decision sustaining the will went upon the ground that the residuary clause created a charitable use and vested the title in the trustees, subject, however, to an executory devise by which the title thus primarily vested in the trustees was subject to divestiture in favor of the corporation thereafter formed. See 3 Pet. pages 113–119, 7 L. Ed. 617; also, per Gray, J., Russell v. Allen, 107 U. S. 168, 169, 2 Sup. Ct. 327, 27 L. Ed. 397. In the course of its opinion and in support of the proposition that, even if the devise to the trustees, or the executory devise, were bad, the heir would take the estate charged with the charitable use, the court said (3 Pet. 118–120, 7 L. Ed. 617):

"The general intent of the testator, that this fund should be applied to the maintenance and support of aged, decrepit, and worn out sailors, cannot be mistaken. And he seems to have anticipated that some difficulty might arise, about its being legally done in the particular mode pointed out by him. And to guard against a failure of his purpose on that account, he directs application to be made to the Legislature for an incorporation, to take and execute the trust according to his will; declaring his will and intention to be that his estate should at all events be applied to the uses and purposes aforesaid; and desiring all courts of law and equity so to construe his will as to have his estate applied to such uses. And to make it still more secure, if possible, he finally directs that his will should in no case, for want of legal form or

otherwise, be so construed as that his relations, or any other persons, should heir, possess, or enjoy his property, except in the manner and for the uses specified in his will. The will looks therefore to three alternatives: (1) That the officers named in the will as trustees should take the estate and execute the trust. (2) If that could not legally be done, then he directs his trustees to procure an act of incorporation, and vests the estate in it for the purpose of executing the trust. (3) If both these should fail, his heirs, or whosoever should possess and enjoy the property, are charged with the trust. That this trust is fastened upon the land cannot admit of a doubt. Whenever a person by will gives property, and points out the object, the property, and the way in which it shall go, a trust is created, unless he shows clearly that his desire expressed is to be controlled by the trustee, and that he shall have an option to defeat it. 2 Ves. Jr. 335. * * * Whoever, therefore, takes the land, takes it charged with the uses, or trusts which are to be executed in the manner above mentioned. And, if so, there can be no objection to the act of incorporation, and the vesting the title therein declared. It does not interfere with any vested rights of the heir. He has no beneficial interest in the land. And the law only transfers the execution of the trust from him to the corporation, and thereby carrying into effect the clear and manifest intention of the testator."

Nor do I find anything in the dissenting opinion to lessen the force of the argument that, if the will was valid, the trust attached to the land in the hands of the devisee.

The argument of the dissentient justices was that the devise was not to a corporation to be created in futuro, but was a devise in præsenti to the trustees, and, if they could not execute their powers in the manner prescribed by the testator, they were to apply to the Legislature for an act of incorporation, a situation which, it was argued, could not give rise to an executory devise. In concluding his opinion on this branch of the case, Mr. Justice Story said:

"That the devise, if a valid devise, is not a devise valid so as to divest the heir at law of his legal estate; but that the devise can have effect, if at all, only as a trust for a charity fastened on the legal estate in his hands." 3 Pet. 154, 7 L. Ed. 617.

That the trust originating in the will continued to be attached to the estate in the hands of the corporation when it became clothed with power to take and execute the trust is sustained by abundant authority other than the Inglis Case. In McCartee v. Orphan Asylum Society, 9 Cow. 437, 18 Am. Dec. 516, there was a devise for charitable uses to the asylum, an incorporated body, subject to a prior estate given in trust to certain trustees, which prior estate had terminated. The chancellor had held that the estate passed to the trustee to the use of the corporation, and that the devise was good at law, but, if not, the testator's intention to devise for a charitable use could be effectuated in equity by virtue of the general powers of the Court of Chancery in cases of trust. Necessarily this involved no exercise of cy pres powers, which are entirely distinct (9 Cow. 442–444, 469, 470, et seq., 18 Am. Dec. 516). This decision was reversed by the Court of Errors (9 Cow. 504, 525, 18 Am. Dec. 516), where it was held that the devise was direct to the corporation, and therefore, as to the real estate, was void under the statute of wills. With the point on which the reversal turned we have nothing to do, but in the course of that part of the chancellor's opinion which covers the question whether, if the devise

was void at law, equity could not enforce it, he examined at length the early cases, and from them deduced the principle that, in obedience to the intention of the testator:

"Equity will regard the substance of the trust; and if the estate devised be described with sufficient certainty, and the objects of the testator's bounty designated or defined, the death, disability, or refusal to act, or other failure of the trustees, will not be suffered to disappoint the intention of the testator; but the trustees themselves, if the estate is vested in them, or the heir, or the executor, where the title devolves upon him, shall be charged with the trust, and the performance of them enforced by the court, for the benefit of those to whom the beneficial interest is given by the will." 9 Cow. 486, 18 Am. Dec. 516.

The conclusion of the learned chancellor was that if the court had jurisdiction to establish and enforce such a trust against the heir or devisee, in favor of the cestui que trust, "these complainants (the society) must surely be entitled to the benefit and application of the principle, in sustaining the trust in their favor for the charitable purposes of the institutions they represent." Id. In other words, a lawful devise of land for a charitable use creates a trust which is not to be regarded differently, so far as the jurisdictional status of the estate devised is concerned, from the ordinary private trust, and in every such case the trust attaches to the land in the hands of the donee. 9 Cow. 484, 18 Am. Dec. 516; Inglis v. Trustees, etc., supra, 3 Pet. 119, 7 L. Ed. 617.

In Owens v. Missionary Society, etc., supra, 14 N. Y. 385, 67 Am. Dec. 160, Judge Selden dwells upon the distinction between an absolute gift and one upon trust for a charitable use, saying:

"There can be no charitable use without a trust. To deny that this bequest was accompanied by a trust, therefore, is to deny that the law of charitable uses applies to the case."

The same learned judge went so far as to say that a bequest to a distinctly charitable corporation, although unaccompanied by any description of the purposes of the bequest, would afford "some basis" for the implication of a trust, "because the objects, purposes, and powers of the corporation being in all cases more or less clearly defined by its charter, the bequest may fairly be presumed to have been intended for those specific objects." 14 N. Y. 385, 386, 67 Am. Dec. 160. Tudor is to the same effect. Tudor, Char. & Mort. (4th Ed.) 175.

In the Court of Errors, one of the minority opinions in the McCartee Case was delivered by Stebbins, S., whose argument, although it did not prevail as applying to that case, seems to me to express most cogently a line of practical reasoning applicable to the case before us. Speaking of the testator, the learned Senator says (9 Cow. 524, 18 Am. Dec. 516):

"His object was not to benefit the society, but, through it, to apply the estate to the charitable purposes for which the society was organized. The society itself is a trustee, and has a trust to perform, which a court of equity would undoubtedly enforce."

The Senator then puts these questions: Suppose the corporation were dissolved, or should otherwise become incapable of executing

the trust, would not the court appoint a new trustee? Or, suppose the corporate powers be enlarged and it be authorized to do a banking business, in addition to the charitable operations for which it was originally incorporated, would it be contended that it was the testator's intention that the proceeds of his device should be used as banking capital? In Owens v. Missionary Soc., supra (14 N. Y. 385, 67 Am. Dec. 160), Judge Selden resorts to a similar illustration. In the light of the foregoing, the situation, unless changed by some controlling rule of law, would seem to be very plain. It involves nothing more than the fundamental elements of a valid testamentary trust of the usual kind, namely: A sufficient expression of intent and an ascertained (or ascertainable) beneficiary; these being declared, whether the beneficiary be a definite person or a corporation capable of taking, the law will fasten the trust upon him who has the legal estate, whether the grantor, heir, testator, or next of kin, as the case may be. See Holland v. Alcock, supra, 108 N. Y. 330, 16 N. E. 305, 2 Am. St. Rep. 420.

[4] That the incorporation of the trustees did not divest or change the nature of the trust seems clear. The language of the minority of the court in the Inglis Case is in accord with this view. On this point Mr. Justice Story said (3 Pet. pages 153, 154, 7 L. Ed. 617):

"It is said that if the trust be valid the Legislature had a perfect right to enforce it, and their act of incorporation amounts to a legal execution of the trust, and vests the estate in the corporation. * * * But I cannot admit that the act of incorporation was intended to have such an effect. It has no terms which divest the legal title of the heir. It merely incorporates the trustees and their successors, and clothes them with the usual powers to carry the trust into effect. It presupposes that the estate was already vested in them by the will. They are made 'capable in law of holding and disposing of the estate' devised by the will. It is true that the uses are added: 'And the same (estate) is hereby declared to be vested in them and their successors in office, for the purposes therein (in the will) expressed.' But this was not, as I think, intended to vest the estate in them *as a legislative investiture, but to declare that the estate was vested in them for the purposes of the charity, and not otherwise.* The preamble of the act, too, shows that the trustees did not ask to have the estate vested in them, but that inconveniences had arisen in the management of the estate from the changes of office. This is very strong to show that the Legislature acted solely for the purpose of avoiding such inconveniences, and not to give them an estate to which they then had no title, and which they then professed to have in their management."

In Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 4 L. Ed. 629, the court, referring particularly to the original private foundation of Dartmouth College, which was succeeded by an incorporated body, said:

"From the fact, then, that a charter of incorporation has been granted, nothing can be inferred which changes the character of the institution. * * * The character of civil institutions does not grow out of their incorporation, but out of the manner in which they are formed, and the objects for which they are created." 4 Wheat. 554, 555, 4 L. Ed. 629.

Of a charter granted subsequent to a foundation established by a deed or will, Tudor says (Tudor, Char. & Mort. [4th Ed.] 185):

"Here the charter is merely machinery for providing an incorporated trustee armed with appropriate powers to carry into effect a pre-existing trust,

and the grant of such a charter does not in any way affect the powers of the court to establish and regulate the charity."

See, also, 2 Perry on Trusts (5th Ed.) § 743; Atty. Gen. v. Free Grammar School, 23 Beavan, 350; In re Manchester Royal Infirmary, L. R. 43 Chan. Div. 420, 428. And this coincides with such late expressions as to be found on the subject in this state. In Dammert v. Osborn, 140 N. Y. 30–42, 35 N. E. 407, 410, the court said of an act somewhat similar to the one in question:

"It is an expression of the will of the supreme legislative power that the gift in question should be received and administered in the manner and for the objects designated in the will. * * * The Legislature in effect said that * * * this gift shall take effect according to the intention of the donor and be administered by a corporate body of its own creation."

In none of the very numerous cases in England and in this country, where the courts have exercised jurisdiction to establish direct or administer charitable trusts, of which corporations were the donees, have I found one where, in the absence of some statutory provision affecting its jurisdiction, it has been suggested that the mere fact that the trust was to be executed by a corporation deprived the court of its power to exercise its usual jurisdiction in similar matters. In fact, there is no authority to be found for such a proposition. I am satisfied that, as the result of the will and the act of 1806, there was established, as between the corporation and the state (representing the ultimate and undefined beneficiaries), a trust relation of such a character as commonly exists in the case of a valid devise for a charitable use.

"In England and in this country, where a court of chancery exists, a charity of the description in question is a peculiar subject of the jurisdiction of that court." Per Nelson, J., Stanley v. Colt, 5 Wall. 119, 169 (18 L. Ed. 502).

Whether jurisdiction to enforce or to administer, as distinguished from the power to establish, such a trust rests in the court's ordinary jurisdiction as a court of equity, or attaches only as an incident to its inherent jurisdiction over charities (Story's Eq. Juris. [3d Ed.] 1161, 1162, 1187–1192; Tudor, Char. & Mort. [4th Ed.] 181), presents, so far as this case is concerned, an academic question of interest to the student, but one which we need not determine. It will satisfy our purpose to find that in either aspect plenary jurisdiction exists. Assuming that jurisdiction rests in virtue of the charitable character of the trust, it will be instructive to ascertain the exact legal nature of the relief sought by this action. At the risk of extending this opinion beyond reasonable limits, because of its peculiar pertinency, I am led to quote from the decision in Lackland v. Walker, 151 Mo. 210–247, et seq., 52 S. W. 414, 424, a case of an estate affected by conditions similar to those alleged in the complaint to exist with respect to the Snug Harbor estate, but where the will expressly prohibited any alienation of the property:

"The concrete question, therefore, is whether, upon a proper showing therefor, a court of chancery has the jurisdiction to authorize an out and out alienation of the property affected by the provisions of the will in question. Primarily, it is clear that this involves no phase of what is known as the pre-

rogative power of cy pres; for here there are a defined charity, a clear trust, and competent trustees to hold the property to the end (citing cases). Nor is it an instance which calls for the exercise of the usual judicial power of cy pres, * * * for here the mode of accomplishing the charity, properly speaking, to wit, the provisions for the maintenance and extension of the Missouri Botannical Garden under the supervision of the trustees named, and for the accomplishment, in other respects, of the charitable ends mentioned in the will, are complete and not sought to be departed from (citing cases). The petition invokes the exercise of the court's power of administration in respect of the forms to be observed in accomplishing and furthering both the object and mode prescribed by the testator. Broadly speaking, the expression 'cy pres power' defines a limitation as well as an affirmative authority. Where the case is one in which the chancellor can act in his judicial capacity, as distinguished from the power exercised in the English system by the Lord Chancellor as representative of the Crown's sign-manual, the jurisdiction over charities is an inherent one; i. e., while courts of equity, as such, possess no power to create a charitable trust, they liberally exercise a jurisdiction to enforce and preserve such a trust when it is valid in its creation. In exercising this jurisdiction, the courts proceed cy pres; they give effect to the express charitable purpose of the donor as near as may be, and in supplying or remedying the defects disclosed in practice they act in effectuation of the controlling purpose disclosed by the instrument presented for construction, so as to preserve and make useful 'what may be called the spirit of the charity' (citing cases). It is a natural and necessary branch of the jurisdiction over charitable trusts that the means or details prescribed for their administration should be subject to be moulded so as to meet any exigency which may be disclosed by a change of circumstances, and to relieve the trust from a condition which imperils or endangers the charity itself or the funds provided for its endowment and maintenance. * * * But, in the very nature of things the jurisdiction merely 'to vary the details of administration' is more liberally exercised, * * * and indeed is perhaps more firmly established and more widely recognized, than is that which is usually called the cy pres power of the court."

[5, 6] In this situation, what jurisdiction has our Supreme Court in the premises? If the relief sought is within its ordinary jurisdiction to direct trustees and administer trusts, nothing further need be said in its support. If it is a part of the jurisdiction peculiar to charities, I think it equally clear that the court possesses it. Conceding the law of charities to exist in this state, that the original jurisdiction of our former Court of Chancery extended to them is, of course, not questioned. Williams v. Williams, 8 N. Y. 525, 558. Although the doctrine of the Williams Case was subsequently repudiated, this was only so far as it attempted to apply the law of charitable uses. Owens v. Missionary Soc., supra, 14 N. Y. 380, 408, 67 Am. Dec. 160; Holland v. Alcock, supra, 108 N. Y. 312, 16 N. E. 305, 2 Am. St. Rep. 420.

The practical effect of the act of 1806, incorporating the plaintiffs herein, was to legalize this particular trust, if it was illegal (Inglis v. Trustees, etc., supra, 3 Pet. page 119, 7 L. Ed. 617), or at least to afford statutory means for its execution, if it was otherwise valid (per Rapallo, J., Holland v. Alcock, supra, 108 N. Y. page 336, 16 N. E. 305, 2 Am. St. Rep. 420). But in whichever way one views it, whether as the removal of an inhibition against jurisdiction, or the reinvesting of powers theretofore taken away, upon the passage of the act of 1806, the jurisdiction of chancery attached (see per Cullen, C. J., People v. Luce, 204 N. Y. 488, 489, 97 N. E. 850, Ann. Cas. 1913C, 1151), and upon the abolition of that court, the powers and duties, not only of

the Court of Chancery but of the chancellor, devolved upon the Supreme Court as such (Butler v. Jarvis, 51 Hun, 248, 4 N. Y. Supp. 137; People v. Luce, supra, 204 N. Y. 478–487, 97 N. E. 850, Ann. Cas. 1913C, 1151).

[7] But notwithstanding I deem it clear that jurisdiction to grant the relief prayed for herein is inherently vested in this court, it is unnecessary to stand on this inherent jurisdiction alone. The Court of Appeals has several times said that, by the Tilden Act, the Legislature intended to restore to courts of equity that power to administer charitable trusts which they were declared to have in the Williams Case, supra. Allen v. Stevens, 161 N. Y. 122, 141, 55 N. E. 568; Matter of Griffin, 167 N. Y. 71–80, 60 N. E. 284; Matter of Cunningham, 206 N. Y. 601, 607, 100 N. E. 437.

The first paragraph of this act as amended (now Personal Property Law, par. 12; Real Property Law, par. 113) is granting, enabling, and legalizing in its nature; the second relates wholly to administration and expressly gives to this court "control" over all gifts of the character described in paragraph 1, and in terms gives it authority, under proper circumstances, to "make an order directing that such gift * * * shall be administered or expended in such manner as in the judgment of the court will most effectually accomplish the general purpose" of the instrument of donation. It is true that the first paragraph of the statute has been held not to apply to trusts created prior to its enactment. People v. Powers, 147 N. Y. 104, 109, 41 N. E. 432, 35 L. R. A. 502; Murray v. Miller, 178 N. Y. 316, 70 N. E. 870; Mount v. Tuttle, 183 N. Y. 358, 76 N. E. 873, 2 L. R. A. (N. S.) 428. This was because the Legislature was without power to alter the directions of a testator or to divert vested rights. People v. Powers, supra, 147 N. Y. 109, 41 N. E. 432, 35 L. R. A. 502. No such reason, however, prevents the application of section 2 to any and all trusts, whether theretofore or thereafter created, provided only they are within the class described in paragraph 1. That the trust in question is so included cannot be doubted. I conclude, therefore, that the Tilden Act is cumulative and supplementary to the inherent jurisdiction of the court, affording an additional and concurrent source of jurisdiction in proper cases.

[8] Nor do I find that any limitation of this jurisdiction is to be inferred from the terms of the act of 1828, amending the act of 1806. The act of 1828 was clearly permissive. It allowed certain things to be done without commanding them. In the absence of unequivocal terms negativing the powers of such a court as was our Court of Chancery when this act was passed, a statute of this character is presumed not to have intended to impair its jurisdiction. The fact, therefore, that section 4 of the act of 1828 authorizes the trustees to lease its property, affords no ground for inferring either an intention to restrain the corporation from selling, or a purpose to restrict the court from exercising its jurisdiction in the premises, when properly invoked.

[9] As to the right of the plaintiffs. to institute this action, making the Attorney General the sole party defendant, I have no doubt. The

third paragraphs of the several sections of the Real and Personal Property Laws, above referred to, expressly provide that the Attorney General "shall represent the beneficiaries," and prescribe it to "be his duty to enforce such trusts" as are covered by paragraph 1 of the several sections.  This also is merely cumulative.  From the earliest times the Attorney General, in England and in other jurisdictions where trusts for charitable uses have been recognized, has been regarded as the representative of the uncertain beneficiaries of a charity. In Williams v. Williams, supra, 8 N. Y. 553, Denio, J., refers to a case in this state in 1708, where the Attorney General proceeded by information.  In Andrews v. Gen. Theol. Sem., 8 N. Y. 559, 563, it appearing that no trustees were before the court, representing a certain charitable legacy, leave was given to amend so as to make the Attorney General a party.  I am referred neither to statute nor authority to show that in this class of cases his functions have since been limited. On the contrary, both statute and unwritten law support the continuance of powers broad enough to include those in question.  1 Exec. Law, § 62;  People v. Miner, 2 Lans. 396;  Davis v. Mayor, etc., 9 N. Y. Super. Ct. 663;  People v. Powers, 83 Hun, 449, 29 N. Y. Supp. 950, 31 N. Y. Supp. 1131;  Allen v. Stevens, 33 App. Div. 485, 54 N. Y. Supp. 8.  Although the last three cases were reversed (14 N. Y. 506, 67 Am. Dec. 186;  147 N. Y. 104, 41 N. E. 432, 35 L. R. A. 502;  161 N. Y. 122, 55 N. E. 568), it was upon grounds which did not conflict with the views expressed below on the point in question.

True, the reported cases are largely ones where the Attorney General has, by bill or information, proceeded against the trustee; but it is not essential that the trustee should rest inert until the apprehended loss or danger has become so imminent as to bring the situation of the estate to the attention of the Attorney General, or that the trustee should proceed at its peril upon some questionable course until that official invokes the jurisdiction of the court to restrain it.  Many cases support the right of the trustee to assume the initiative and to come into court for instructions or other proper relief.  The following are illustrative of a long line of authorities:  McCartee v. Orphan Asylum Society, supra (per Jones, Ch., 9 Cow. 437, 482, 18 Am. Dec. 516); Governers of Christ Hospital v. Atty. General, 5 Hare, 257;  Wardens, etc., of Clum Hospital, v. Powys et al., 6 Jurist. 252;  Weeks v. Hobson, 150 Mass. 377, 23 N. E. 215, 6 L. R. A. 147;  Lackland v. Walker, supra;  Academy of the Visitation v. Clemens, 50 Mo. 167.

[10] Under the Tilden Act, the proceeding contemplated seems to be by summary petition.  But for many reasons, this should not be construed as ousting the court of its ordinary jurisdiction by action.  A somewhat similar situation seems to have arisen in England both under the 43d Elizabeth and 52d George III, c. 101; but the courts of that country held that the statute did not exclude their customary jurisdiction by bill.  See Tudor, Char. & Mort. (4th Ed.) 379, 382; Story, Eq. Juris. 1147.

[11] The objection that to grant the relief prayed for would in effect destroy a vested estate is without weight.  The title is vested in the corporation, charged with the trust under the will.  The heirs

of the testator have no interest, reversionary or otherwise. The uncertain beneficiaries of the trust, i. e., the "aged, decrepit and worn out sailors," have no standing in court for any purpose. Their interests are in the care of the state as parens patriæ, and are represented by the Attorney General. The numerous authorities are uniform in holding that, in granting relief similar to that prayed for in this action, courts do no more than mould the form of the devise to suit the necessity of changed conditions; no diversion of the gift is either sought or intended. Stanley v. Colt, supra; Ould v. Washington Hospital, 95 U. S. 303, 24 L. Ed. 450; Lackland v. Walker, supra.

[12] Having thus disposed of all the objections to jurisdiction, the final question remains: Are the facts alleged prima facie sufficient to justify its exercise? The situation disclosed is not one of mere expediency, but of an existing exigency. A long continued and progressive deterioration imperils the estate; and while the situation may not justify the fear that, if left to itself, the estate will either be annihilated or its net income be so reduced as to leave insufficient to care for a number of beneficiaries equal to the original 50 named in the will, it is manifestly one which justifies the trustees in seeking an opporunity to make proof of the facts and to secure the authority and instructions of the court. See Lackland v. Walker, supra, 151 Mo. 265 et seq., 52 S. W. 414, where the authorities are collated.

The judgment should be reversed, with costs, and the demurrer overruled, with costs, with leave to the defendant to withdraw demurrer and to answer on payment of costs in this court and in the court below. All concur.

INGRAHAM, P. J. I concur with my Brother HOTCHKISS in his opinion and merely wish to state what I consider to be the real question that is now before us.

What the plaintiff asks for is a construction of the trust under which it holds the real property which was devised by Capt. Randall's will and which from the probate of that will in 1801 has been administered by the trustees named in the will or by the corporation created by the act of 1806, i. e., one of the plaintiffs in this action. As to whether the court will construe this will or give the trustees instruction is not now before us; the sole question being whether upon the facts stated the plaintiffs or either of them have a right to apply to a court of equity for a construction of the will and an adjudication as to the powers of the trustees. I think it clear that the testator intended to convey this real property described in the complaint to the persons that he named in his will as trustees to carry out the trust outlined in the will. If the trust was a valid trust, the title to the property vested in the trustees; if it was not a valid trust, the trustees took no title, and the title vested in the testator's heirs at law, or, if there were no heirs at law competent to take the real property, then the property escheated to the state.

Of course, the question as to whether this was a valid trust is not before us. Certain persons claiming to be heirs at law attacked the validity of this trust, and their claim to the property was defeated in

the courts, which judgment was subsequently affirmed by the Supreme Court of the United States. Inglis v. Trustees, etc., 3 Pet. 137, 7 L. Ed. 617. However that may be, for more than a hundred years this title has been held and enjoyed by the trustees named in the will or their successors, the corporation created by the Legislature of this state by the act of 1806, and there is no one now before us questioning the validity of the trust or the rightful ownership of the property by the trustee. I do not understand that the Attorney General claims that by way of escheat or otherwise the title to this property has vested in the state or that the state has any right to the property as its owner. And thus it seems to me there can be no doubt that the title to the property passed to the original devisees in trust to devote it to the purposes mentioned in the will. The will itself contained the provision that, if this trust could not legally be carried out according to the testator's express intention without an act of the Legislature, it was his will and desire that the trustees would as soon as possible apply for an act of the Legislature to incorporate them for the purposes above specified. To carry out this wish of the testator the trustees in the year 1806 applied to the Legislature, which passed an act, being chapter 4 of that year. The preamble of that act recited the will of the testator; that the testator had declared his intention to be that the said estate should, at all events, be applied to the purposes mentioned and to no other; and they prayed to be incorporated for the purposes expressed in the will. It was then enacted that the trustees named in the will and their successors by virtue of their said offices were constituted a body politic; they were declared to be capable in law of holding and disposing of the said real and personal estate according to the intention of the said will; and the same was declared to be vested in them and their successors in office for the purposes therein expressed, which involved the execution of the trust created by the will.

I think it clear that by this act a corporation was created and vested with the title to the property held by the trustees to carry out the purposes of the will. Thus, so far as the state was concerned, it seems to me it released any title that it could have had by way of escheat or otherwise in the property in question to the corporation thereby created, and validated the trust if its legality was doubtful, and the corporation thereby became the owner of the property, in trust, however, for the purposes expressed in the will of the testator. Of course, as the testator had heirs at law capable of taking the property, this act of the Legislature could not have affected their interest; and, if the testator had no heirs at law capable of taking and holding real property, the property escheated to the state, which had released its interest to the corporation as trustee for the purposes of the will. Therefore, so far as appears, title to the whole property had vested in the corporation in trust for those to be benefited as expressed by the testator, and since that time they have exercised that trust and applied the income of the property to the purposes expressed in the will The trustee (the corporation) now applies to this court for a construction of the terms of the trust and by this action has asked the court to instruct it as to the power that it has in dealing with the trust estate.

It is quite clear that there is nobody interested in the execution of this trust except the beneficiaries, who are "the aged, decrepit and worn-out sailors." The complaint alleges that the trustees have maintained an institution for the relief of sailors of this description and have expended the income for that purpose during the long period that that trust has been in existence; but it is manifestly impossible to make the class of sailors designated by the testator parties to the suit. The plaintiff has therefore made the Attorney General a party, asking that he come in and assist the court in determining the matters upon which the trustees desire instruction.

I think, therefore, that the corporation is a trustee holding the real property in trust for the benefit of a certain class; that there are questions which require the construction of the terms of the trust by the court for the advantageous execution of the trust; that the trustee has the right to apply to the court for the purpose of obtaining such instruction; that there are no parties in existence interested in the maintenance of the trust, except the Attorney General of the state, who can be made parties to the action; and the only serious question, as I view it, is whether the Attorney General is a proper party to be made a defendant. That the Attorney General is a proper party defendant is, I think, put at rest by the provisions of the Real Property Law (chapter 52 of the Laws of 1909 [Consol. Laws 1909, c. 50] § 113), and I agree with what my Brother HOTCHKISS says upon that point.

It is quite probable that in view of the very satisfactory opinion of my Brother HOTCHKISS this concurring memorandum is unnecessary; but the question presented is both unusual and interesting, and I have thought it not amiss that I indicate the process by which I have arrived at the same result. All concur.